BUTTS, Justice.
Azar J. Droke sued Joe Murphy and his wife Jeannette Murphy, alleging fraud, misrepresentation, and wrongful foreclosure on a real estate mortgage. Droke claimed that the Murphys were guarantors of a business loan Droke had obtained from First Alabama Bank; that Joe Murphy had deceitfully represented to her that he would make the installment payments for her for three months while she was absent from the United States; and that the Murphys paid off her loan and took an assignment of her mortgage from the bank and foreclosed on it so as to wrongfully gain title to Droke’s business. The jury found in favor of Jeannette Murphy on all counts and in favor of Joe Murphy on the misrepresentation and wrongful foreclosure counts; the jury found in favor of Droke. and against Joe Murphy on the fraud count and awarded compensatory damages of $62,000. Joe Murphy appeals.
Upon review of a jury verdict, we presume that the verdict was correct; we review the tendencies of the evidence most favorably to the prevailing party, and we indulge such reasonable inferences as the jury was free to draw from the evidence. Campbell v. Burns, 512 So.2d 1341 (Ala. 1987). We will not overturn a jury verdict unless the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates the verdict was wrong and unjust. Campbell.
The evidence, viewed most favorably to Droke, indicates the following: In May 1987, Droke, who was unmarried at the time, signed a lease-purchase agreement relating to a car wash operation in Athens, with a three-year option to purchase the business for $160,000. She hired employees for the car wash and worked there herself every day. Shortly after she began operating the car wash, Joe Murphy brought his truck to the car wash; when he did, he met Droke, whom he had not known before. He began to visit Droke frequently at the car wash and, in the course of their conversations, she eventually told him the details of her lease-purchase agreement. Murphy suggested that she exercise the option to buy the car wash and encouraged her to apply for a business loan at First Alabama Bank, where he had been on the board of directors for some years. Murphy then obtained a letter of appraisal for Droke’s business, to help her obtain the loan.
The bank initially rejected Droke’s application, but later issued a business loan of $200,-000 to Droke after Murphy and his wife, Jeannette, agreed to cosign as guarantors. Dining this time, Droke and Murphy engaged in a sexual affair, which Droke soon ended. Although Droke subsequently married, she and Joe Murphy remained platonic friends. At one point, Droke and her husband borrowed $50,000 from Joe Murphy; they repaid the loan completely and on time.
Droke made regular payments on her First Alabama loan for about five years; however, in 1988, her car wash went through financial difficulties and she missed three monthly payments. Droke then learned of a temporary employment opportunity in Kuwait; taldng that opportunity would require her to be in Kuwait for three months. She contacted Murphy and told him that she had missed the last three payments on the business loan and that she needed the temporary job in Kuwait to earn money to bring the payments up to date. Murphy assured her that he would make the three overdue payments, make the next three payments as they came due while she was away, and allow her to “settle up” with him when she returned.
After Droke left for Kuwait, Murphy began coming to the car wash, telling employees that he owned the business and supervising their work. Within 20 days after Droke had left for Kuwait, Murphy went to the bank, paid the balance of the loan, and had the bank assign the mortgage to him. He offered the car wash manager the opportunity to stay on and discussed the terms of his continued employment. The car wash manager informed Droke by telephone of Murphy’s actions, and she contacted the bank to verify that Murphy had paid off the note and had taken an assignment of the mortgage.
When Droke returned from Kuwait, she immediately met with Murphy and demanded *516 an explanation. Murphy demanded that she immediately pay him the $160,000 he said he had paid on the loan for her and told her that if she did not make this payment then he would own the car wash and she would have to work under his supervision. Droke could not obtain the full amount quickly enough, and Murphy foreclosed on the mortgage. Droke obtained a loan from another individual (the principal and interest payments amounted to $215,000) and redeemed the property during the statutory redemption period. The jury’s compensatory damages award of $62,000 reflects the difference between the $153,000 Droke would have owed to First Alabama if Murphy had not paid off the loan and taken an assignment of the mortgage and the $215,000 she had to spend to redeem the property.
At trial, Droke claimed that Murphy had deceitfully represented to her that he would make payments on the loan until she returned from Kuwait. She testified that when she met with Murphy after she had returned, he told her that he still loved her and that if she did not pay him immediately he would own the business and she would have to “deal with him.”
Droke offered into evidence the letter of appraisal that Murphy had obtained as part of her loan application, as proof that Murphy knew the value of the ear wash and intended to eventually become the holder of the mortgage. There was also evidence suggesting that Murphy had a history of using his wealth to establish relationships with women. Murphy argued that, according to the terms of the loan document, Droke was in default when she left for Kuwait and, he argued, the bank had constructively demanded that he pay off the loan. He further argued that, by demanding immediate payment from Droke of the full loan amount after she returned from Kuwait, he was merely exercising his legal rights as the holder of the mortgage.
Murphy argues that the trial court erred in admitting into evidence the letter of appraisal and the testimony concerning his wealth. We disagree. Although the trial court overruled Murphy’s objections to the appraisal letter, it gave the following limiting instruction:
“[I]t comes in as what he knew and the communication between the parties and it’s not going into evidence to prove the value of the car wash. In other words, it doesn’t prove anything about what the car wash was worth. It just goes to show the information the parties had between them at that time, the information that it had been appraised.”
Because this instruction was sufficient to inform the jury of how to properly limit its consideration of the appraisal letter, we find no error in admitting it into evidence.
In regard to the evidence concerning Murphy’s wealth, we recognize that a jury’s resolution of issues must be based upon applicable rules of law and upon evidence properly presented at trial, not upon the economic situation of either party or upon the degree of the burden that might result from a judgment. Holt v. State Farm Mut. Auto. Ins. Co., 507 So.2d 388 (Ala.1986). In determining whether the admission of evidence regarding a party’s financial status constitutes reversible error, however, this Court must consider the evidence, the argument itself, the prejudicial effect of the evidence and the argument, and any limiting or cautionary actions of the trial court. Otis Elevator Co. v. Stallworth, 474 So.2d 82 (Ala. 1985).
The theory of Drake’s case was that Murphy used his superior wealth and power to induce her to obtain the loan, then fraudulently took over the mortgage and foreclosed on it. To this end, she presented evidence of several instances in which it appeared that Murphy may have used his wealth to lure women into sexual affairs. Droke did not offer detailed evidence of Murphy’s wealth, nor did Murphy object to the general references to his wealth and his standing in the community. Murphy himself referred to his own assets, and one of his own witnesses characterized the Murphys as “some of the richest people in Limestone County” and as owning personal assets that were “many, many times” $225,000. Moreover, the trial court later instructed the jury that it was not to consider Murphy’s wealth in determining what amount of damages to assess, in the *517 event it found in Droke’s favor. Under these circumstances, we find no error in the court’s permitting the evidence regarding Murphy’s wealth and no error in regard to the general references Droke made concerning Murphy’s wealth.
Finally, Murphy argues that any representation he made to Droke concerning repaying the loan was merely a promise to perform a future act and that Droke’s evidence of such a representation was therefore insufficient to support her fraud claim. He correctly points out that to support a claim of fraud based on a promise to perform a future act, Droke was required to show that, at the time Murphy made the promise, he had no intention of carrying it out, but had a present intent to deceive her. First Bank of Boaz v. Fielder, 590 So.2d 893 (Ala.1991). Failure to perform a promised act is not in itself evidence of an intent to deceive at the time the promise was made; however, the factfinder may consider that failure, together with other circumstances, in determining whether, at the time the promise was made, the promisor intended to deceive. Fielder. Where the plaintiff presents substantial evidence that the defendant had an intent to deceive, it is for the jury to decide whether the defendant actually had such an intent. Fielder.
We find that the record contained substantial credible evidence from which the jury could conclude that Murphy intended to deceive Droke when he promised to keep her payments current for her until she returned from Kuwait. Droke testified that she left the country, and her obligation on the loan, only because Murphy had assured her that he would make the payments until she returned. Almost immediately after she left, Murphy began supervising the car wash and then took over the mortgage, rather than merely making the payments on the note, as he had promised Droke he would do. It is disputed whether the bank demanded full payment of the loan from Murphy; Murphy himself testified that the bank only “insinuated” that the loan had to be paid in full. Although Murphy testified that he did not want the ear wash and merely demanded from Droke the payment he was legally due from her, there is evidence that Murphy knew Droke was unable to raise this large sum on demand.
Viewing the evidence in the light most favorable to Droke, and drawing from that evidence all reasonable inferences supporting her claims, as we are required to do, we conclude that a jury could reasonably find that Murphy, at the time he promised Droke to make the payments on the business loan, intended to deceive her. The jury could reasonably infer that she relied on his promise to make the payments and that because of her reliance she was obliged to take on an additional $62,000 debt to redeem the property. In view of the evidence and the reasonable inferences the jury could have drawn from it, the judgment based on the jury’s verdict is affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON and INGRAM, JJ., concur.
HOUSTON, J., concurs in the result.