On November 23, 1994, Mark Barlow filed a complaint against Liberty National Life Insurance Company, Robin Golden Ledbetter, and various fictitious defendants. Barlow asserted claims of negligence, wantonness, willful or reckless misrepresentation, deceit, and suppression in the sale and exchange of various life insurance policies. Barlow sought compensatory and punitive damages. Ultimately, Barlow dismissed Ledbetter with prejudice. The case was tried before a jury in March 1996. The trial court granted Liberty National's motion for a directed verdict as to Barlow's negligence and wantonness claims and as to punitive damages. The jury returned a verdict in favor of Barlow and against Liberty National, awarding Barlow $17,210 in compensatory damages. The trial court entered a judgment accordingly. Barlow filed a motion for a new trial, which was denied.
Barlow appeals, raising four issues: (1) whether the trial court erred in directing a verdict on Barlow's claim for punitive damages, (2) whether the trial court erred in permitting Liberty National's attorney to make statements of fact that were not in evidence, (3) whether the trial court erred in charging the jury on the elements of fraud, and (4) whether the trial court erred in allowing Liberty National's attorney to cross-examine Barlow as to the dollar amount of damages that the jury should award. Liberty National cross-appeals, raising two issues: (1) whether the trial court erred in denying its motion to dismiss after Ledbetter was dismissed from the case with prejudice and (2) whether the trial court erred in failing to direct a verdict in favor of Liberty National on the statute of limitations.
It is well settled law in Alabama that a party who prevailed in the trial court can appeal only on the issue of the adequacy of damages awarded. Ex parte Weyerhaeuser Co., 702 So.2d 1227
(Ala. 1996); Nichols v. Perryman, 615 So.2d 636 (Ala.Civ.App. 1992).
Barlow prevailed in the trial court; therefore, the only issue to be addressed is Barlow's first issue: whether the trial court erred in directing a verdict on Barlow's claim for punitive damages.
 Punitive Damages
In a procedurally similar case, Ex parte Norwood Hodges MotorCo., 680 So.2d 245 (Ala. 1996), our supreme court stated:
 "Our decision in Hines v. Riverside Chevrolet-Olds, Inc., 655 So.2d 909 (Ala. 1994), is dispositive of this case. There we held:
 " '[T]he question whether there is clear and convincing evidence of wrongful conduct that will support an award of punitive damages does not arise until the trial, when a defendant objects to the submission to the jury of the question of punitive damages on the ground that clear and convincing evidence of the requisite wrongful conduct has not been presented.'
 In Hines, the Hineses sought compensatory and punitive damages, alleging fraudulent misrepresentation and intentional suppression regarding the sale of a car. The trial court entered a summary judgment for the dealer, Riverside, because it determined that the Hineses had not proven misrepresentation and suppression by clear and convincing evidence. In reaching our holding, we first interpreted § 12-21-12 and § 6-11-20, Ala. Code 1975. Section 12-21-12(a) and (c) state:
 " '(a) In all civil actions brought in any court of the state of Alabama, proof by substantial evidence shall be required to submit an issue of fact to the trier of *Page 170 
the facts. Proof by substantial evidence shall be required for purposes of testing the sufficiency of the evidence to support an issue of fact in rulings by the court, including without limitation, motions for summary judgment, motions for directed verdict, motions for judgment notwithstanding the verdict, and other such motions or pleadings respecting the sufficiency of evidence.'
 " '(c) With respect to any issue of fact for which a higher standard of proof is required, whether by statute, or by rule or decision of the courts of the state, substantial evidence shall not be sufficient to carry the burden of proof, and such higher standard of proof shall be required with respect to such issue of fact.'
"Section 6-11-20 states, in pertinent part:
 " '(a) Punitive damages may not be awarded in any civil action, except civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. . . .
 " '(b) As used in this article, the following definitions shall apply:
 " '(1) Fraud. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.
 " '(2) Malice. The intentional doing of a wrongful act without just cause or excuse, either:
 " 'a. With an intent to injure the person or property of another person or entity, or
 " 'b. Under such circumstances that the law will imply an evil intent.
 " '(3) Wantonness. Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.
 " '(4) Clear and convincing evidence. Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.
 " '(5) Oppression. Subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights.'
"(Emphasis added.)
 " 'Gross' is defined in Black's Law Dictionary
702 (6th ed. 1990) as 'not to be excused,' 'flagrant,' 'shameful.'
 "Justice Almon, writing for the court in Hines, stated the following in construing the two statutes quoted above:
 " 'Section 12-21-12(a) establishes the quantum of evidence necessary to submit an issue of fact to the trier of fact, when the sufficiency of the evidence to support an issue of fact is tested. Unless a higher standard is provided by statute, rule, or decision, substantial evidence is required to submit an issue of fact to the trier of fact. § 12-21-12(c). This statute limits the authority of a trial court to submit an issue of fact to the trier of fact.
 " 'Section 6-11-20(a), however, limits the authority of the trier of fact to award punitive damages — that is, a trier of fact may not award punitive damages unless the plaintiff proved by "clear and convincing" evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. Thus, by its very language, § 6-11-20 does not define the standard for determining whether a genuine issue of fact, material to a claim alleged by the plaintiff, exists for the trial court to submit to the trier of fact; rather, it defines the standard of proof for determining whether the trier *Page 171 
of fact has, or had, the authority to award punitive damages.'
"655 So.2d at 925 (emphasis omitted).
 "Thus, in this case, the trial court should have determined whether the evidence warranted submitting the issue of punitive damages to the jury, i.e., whether there was evidence of such quality and weight that a jury of reasonable and fair-minded persons could find by clear and convincing evidence that the defendant consciously or deliberately engaged in fraud; then the court should have instructed the jury that, to award punitive damages, it must find that Rosa Iliff had proven by clear and convincing evidence that Hodges consciously or deliberately defrauded her."
680 So.2d at 248-49.
The record reveals that in 1981, Robin Ledbetter, an agent of Liberty National, sold Barlow a $30,000 "Econoflex" life insurance policy and that in January 1982, Ledbetter sold Barlow a second $30,000 "Econoflex" life insurance policy. Barlow was 18 years old when he purchased the "Econoflex" policies. In 1984 Ledbetter approached Barlow about Liberty National's new "LifePlus" life insurance policy. Barlow testified that Ledbetter told him and his mother that Barlow needed to plan for the future; that the "LifePlus" policy had investment potential; and that in the future, if Barlow had children or became disabled, he would build up enough cash value that the policy would pay for itself. Barlow specifically testified that Ledbetter told him that the policy was an "investment" and showed him how it accumulated cash value that he could plan on as a "nest egg." He also testified that Ledbetter compared the "LifePlus" policy to a CD and an IRA and that she showed him how the policy was paying more interest than a CD. Barlow further testified that when he told Ledbetter that he did not want to lose what he had paid for the "Econoflex" policies for the last three years, Ledbetter informed him that he would not start at zero with the "LifePlus" policy because his "Econoflex" policies would roll over into the new policy. Based on Ledbetter's representations, Barlow agreed to "exchange" his "Econoflex" policies for a $50,000 "LifePlus" policy.
Ledbetter denied telling Barlow, or anyone, that a "LifePlus" policy was an investment or a savings vehicle. Ledbetter testified that a "Econoflex" policyholder began accumulating cash value in his or her sixth year of paying premiums. She also testified that because Barlow had paid premiums for only three years, he had not accumulated any cash value in his "Econoflex" policies when he exchanged them for the "LifePlus" policy. Therefore, Barlow began his "LifePlus" policy at a zero cash value.
Ledbetter testified that she had mistakenly listed the amount of Barlow's "Econoflex" policies as $20,000 each on the "LifePlus" policy application and that, if the policy amounts had actually been a total of $40,000, she would have received a commission on the $10,000 difference between the "Econoflex" policies and the "LifePlus" policy, as well as a commission on the difference between the premiums. She also testified that there was a difference in the interest rates on a loan from the "Econoflex" policies, which was 6%, and a loan from the "LifePlus" policy, which was 8%. Ledbetter further testified that there was a surrender charge on the "LifePlus" policies; however, there was not a surrender charge on the "Econoflex" policies. She testified that she was never told that Barlow did not receive his policies, although she could not remember delivering the policies to him, and that her dealings with Barlow were in the line and scope as an agent of Liberty National.
Barlow testified that he married in 1987, that his wife was concerned about their life insurance coverage, and that his wife made an appointment with a Liberty National agent, Terry Wells, to meet and discuss their insurance needs. He testified that he and his wife met with the agent, who asked to see his insurance policy. Barlow informed the agent that he had not received a policy, and the agent asked Barlow to sign a document to enable Barlow to receive a policy.
Barlow testified that he received a letter dated July 1, 1987, from John Samford, the president of Liberty National. That letter stated that the "LifePlus" policy builds cash value at current interest rates and that cash "will be helpful someday whether you use it *Page 172 
for a child's education, business opportunities or retirement for yourself, or any type of emergency." In the same letter Samford also discussed the tax advantages of the "LifePlus" policy and the accumulated and cash surrender value of the policy. Barlow testified that after speaking with Wells and receiving Samford's letter, he met with Rubin Quidley, a district manager for Liberty National. Barlow testified that he informed Quidley that he had a few questions about his "LifePlus" policy, that he wanted to make sure that he had "gotten credit for [his] first three years [of "Econoflex" premiums], and that [the LifePlus] policy was, in fact, a good policy for [him] to be in." Barlow further testified that Quidley informed him that Quidley or someone in the home office would review his policy and make sure that everything was in order. Thereafter, Barlow received a letter dated July 24, 1987, from Tommy Hamby, the second vice-president of the premium accounting department of Liberty National. In the letter Hamby stated that he had reviewed all of Liberty National's records regarding the exchange of Barlow's "Econoflex" policies for the "LifePlus" policy and that the exchange was to Barlow's benefit because "over the long run [the policy] could potentially build up a much greater cash value than the original policies." Barlow testified that he did not do anything further with regard to the "LifePlus" policy because of Hamby's representation that the exchange was to his benefit.
Barlow testified that in 1993, after his wife had a baby and they had built a house, his wife contacted Liberty National about increasing their insurance coverage. He also testified that his wife received a copy of his "LifePlus" policy. After examining the policy, he became concerned because the policy contained no discussion about the policy building a nest egg for the future, for retirement, or for planning ahead. Thereafter, Barlow contacted an attorney, who obtained copies of Barlow's "Econoflex" policies. Barlow testified that when he compared the "Econoflex" policies to the "LifePlus" policy, he did not see that [the "LifePlus"] policy was so much greater than [the "Econoflex" policies]. He further testified that he learned for the first time that he had less insurance coverage with the "LifePlus" policy than with the "Econoflex" policies. Barlow also testified that Ledbetter did not inform him that the interest rate on a loan from the "LifePlus" policy was 2% higher than the rate on a loan from the "Econoflex" policies; that there would a surrender charge on the accumulated cash value of the "LifePlus" policy at surrender; and that because his "Econoflex" policies were allowed to lapse, he would not receive credit for the three years of premiums paid on those policies.
Although Ledbetter denied telling any client that the "LifePlus" policy was an investment, three other witnesses testified that Ledbetter had represented the "LifePlus" policy as an investment to them. Barlow's mother testified that Ledbetter represented the "LifePlus" policy as an investment to Barlow and to her. Two other witnesses testified that other Liberty National agents had represented the "LifePlus" policy as an investment to them. Additionally, a former Liberty National agent testified that he had represented the "LifePlus" policy as an investment to his clients. The "LifePlus" sales guide, given to Liberty National agents, states that "savings can be accumulated for future financial obligations such as a down payment on a home or education for children. Favorable tax considerations and attractive current interest rates make LIFEPLUS even more appealing as a cash accumulation vehicle for future opportunities and emergencies."
Jack Arnold Kelley, Jr., a Liberty National senior vice-president of marketing administration, a former vice-president of field management in charge of sales operations, and formerly in charge of the development of "LifePlus" insurance policies, testified that he did not believe that insurance should be sold as an investment and that, in his opinion, it would be wrong for any agent of Liberty National to misrepresent a policy to make a sale. He also testified that he was not aware of any Liberty National agents selling "products" as investments. Kelley further testified that Ledbetter should not have told Barlow that his "LifePlus" policy would be credited with the amount of his "Econoflex" premiums. *Page 173 
The trial court submitted Barlow's claims of willful and/or reckless misrepresentation, deceit, and suppression to the jury. The trial judge directed a verdict in favor of Liberty National on the issue of punitive damages, stating, "I simply find no evidence of gross, oppressive or malicious conduct as that standard is articulated in Section [6-11-20]."
The jury could have found from the evidence that Ledbetter intentionally misrepresented to Barlow that the "LifePlus" policy was an investment or a savings vehicle for Barlow's retirement or future needs and that Barlow's premiums for his "Econoflex" policies would be credited to his "LifePlus" policy. The jury could also have found that Liberty National and its agents had a pattern and practice of misrepresenting the "LifePlus" policy as an investment or a savings vehicle to induce policyholders to exchange their policies for a "LifePlus" policy. Further, the jury could have found that these misrepresentations were concealed from Barlow by Ledbetter's failure to deliver the "Econoflex" and "LifePlus" policies to Barlow and by Hamby's representations to Barlow in the July 24, 1987, letter.
After a review of the evidence in this case, we conclude that there was substantial evidence to support a jury question on whether Liberty National consciously, or deliberately, defrauded Barlow in such a manner as would support a claim for punitive damages according to the standards set forth in Ala. Code 1975, § 6-11-20. Therefore, the trial court erred in directing a verdict in favor of Liberty National on the issue of Barlow's punitive damages claim and in denying Barlow's motion for a new trial.
 Cross-appeal
Liberty National contends that it was entitled to a directed verdict on Barlow's claims of misrepresentation, deceit, and suppression because Ledbetter was dismissed from the action with prejudice.
Barlow sued Liberty National not only for the actions of Ledbetter, but for the actions of Liberty National, i.e., Hamby's 1987 assurances to Barlow that the exchange of policies was to Barlow's benefit; Liberty National's failure to deliver the "LifePlus" policy to Barlow, despite his request; and Liberty National's marketing "LifePlus" as an investment or savings vehicle.
Rule 41, Ala. R. Civ. P., governs the voluntary and involuntary dismissal of actions and the dismissal of defendants. Hope Developers, Inc. v. Vandiver, 582 So.2d 1073
(Ala. 1991). "A dismissal of an action with prejudice constitutes an adjudication on the merits that bars any subsequent litigation." Calhoun v. Pennsylvania Nat'l MutualCasualty Ins. Co., 676 So.2d 1332, 1334 (Ala.Civ.App. 1996) (citations omitted).
Our supreme court has held as follows:
 " '[W]hen [a] principal and his agent are sued in [a] joint action in tort for misfeasance or malfeasance of the servant, and his liability for the conduct of said servant is under the rule of respondeat superior, a verdict in favor of the servant entitles the master to have the verdict against him set aside.' "
Larry Terry Contractors, Inc. v. Bogle, 404 So.2d 613, 614
(Ala. 1981) (quoting Louisville N.R. Co. v. Maddox, 236 Ala. 594,600, 183 So. 849, 853 (1938)). Therefore, we conclude that the trial court erred in not dismissing Barlow's respondeat superior claims against Liberty National for Ledbetter's actions.
Liberty National also contends that Barlow's claims for misrepresentation, deceit, and suppression were barred by the statute of limitations. Liberty National argues that Barlow had notice of the alleged fraud in 1987, when he received the July 1, 1987, letter from the president of Liberty National, which caused Barlow to make inquiries about his insurance policy.
The statute of limitations for fraud claims is two years. § 6-2-38(l), Ala. Code 1975. However, the statute of limitations for a fraud claim does not begin to run until the fraud is discovered, or should have been discovered. § 6-2-3, Ala. Code 1975; Kelly v. Connecticut Mutual Life Ins. Co., 628 So.2d 454
(Ala. 1993). The question of when a party discovered, or should have discovered, the fraud is a question for the jury. Kelly.
The question of when a plaintiff should have discovered the fraud is taken away from the *Page 174 
jury and is decided as a matter of law only in cases where the plaintiff actually knew of facts that would have put a reasonable person on notice of the fraud. Id.
The statute of limitations is tolled as to a fraud claim if, after discovery and inquiry, the plaintiff is misinformed or falsely informed by the defendant and the plaintiff justifiably relies on the defendant's misrepresentations. Kelly, supra;Howard v. Mutual Sav. Life Ins. Co., 608 So.2d 379 (Ala. 1992).
Barlow received notice of the fraud as a result of the July 1, 1987, letter from the president of Liberty National. Barlow contacted Liberty National's district manager with his concerns, and the district manager contacted Liberty National's home office in Birmingham. Thereafter, Barlow received a letter from Hamby, the second vice-president of Liberty National in charge of the premium accounting department, assuring Barlow that the exchange of his "Econoflex" policies for the "LifePlus" policy was to his benefit. Barlow relied on Hamby's assurances and did nothing further until he received his "LifePlus" policy in 1993.
The question of whether Barlow justifiably relied on Hamby's representation was a question for the jury. Kelly and Howard,supra. Therefore, we conclude that the trial court did not err in submitting the question of when Barlow discovered, or should have discovered, the fraud to the jury.
The judgment of the trial court is reversed and this cause is remanded for further proceedings.
The foregoing opinion was prepared by Retired Appellate Judge L. Charles Wright while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Code 1975.
REVERSED AND REMANDED.
All the judges concur.