Alabama Farmers Cooperative, Inc. ("AFC"), petitioned this Court for a writ of certiorari to review the judgment of the Court of Civil Appeals in Alabama Farmers Cooperative, Inc. v.PricewaterhouseCoopers, LLP, 911 So.2d 689 (Ala.Civ.App. 2004). In that opinion the Court of Civil Appeals affirmed the summary judgment for PricewaterhouseCoopers, LLP ("PwC"), entered by the trial court on the ground that the statute of limitations governing AFC's negligence and fraud claims against PwC had expired before AFC filed its action. On August 17, 2004, we granted the writ to address the issue whether AFC presented substantial evidence creating a genuine issue of material fact as to when it knew or should have known of the alleged misrepresentations or concealments in PwC's financial statements so as to begin the running of the statutory limitations period on its fraud claim. We reverse and remand.
The Court of Civil Appeals set out the following facts:
 "This appeal arises from litigation between Alabama Farmers Cooperative, Inc. (`AFC'), a not-for-profit corporation with branches located throughout Alabama, and PricewaterhouseCoopers, *Page 698 
LLP (`PWC'), which served as AFC's auditor and financial advisor during the years material to this action. This litigation arose after Bobby Davis, an officer of AFC, engaged in dishonest and unauthorized conduct; specifically, in 1988 Davis signed numerous long-term leases that had not been approved by AFC's board of directors, and those leases eventually caused AFC to suffer millions of dollars in damages.
 "Originally, Noland Lindsey filed this action, both in his individual capacity and as a shareholder of AFC, against PWC and the individual directors of AFC in the Franklin Circuit Court on October 6, 2000; he asserted claims of accounting malpractice, conspiracy, suppression, fraud, breach of fiduciary duty, and negligent supervision and training. Lindsey specifically contended that PWC, as AFC's auditor, should have discovered and disclosed Davis's misconduct in a company audit.¹ On December 7, 2000, AFC filed a motion to intervene, arguing that it was the real party-in-interest. See Rule 24, Ala. R. Civ. P. AFC also filed a complaint asserting two claims against PWC, one alleging negligence and one alleging a breach of contract. AFC's motion to intervene was granted.² In June 2001, Lindsey and AFC jointly filed an amended complaint alleging claims of negligence, fraud, and negligent supervision. Significantly, that amended complaint did not include a claim alleging breach of contract, even though AFC's motion to intervene had indicated that such a claim would be asserted. Much of the subsequent lengthy procedural history of this action is not material to the issues addressed in this appeal.
 "In October 2001, the parties filed a joint motion to transfer the case to the Morgan Circuit Court; that motion was granted. Subsequently, extensive written discovery occurred and numerous depositions were taken. In July 2002, AFC filed a motion to set the case for trial, stating that the case would be ready for trial in September; AFC did not attempt to amend its pleadings or to add a breach-of-contract claim at that time. In September 2002, PWC filed a motion for a summary judgment, arguing that all of AFC's tort claims were barred by the applicable statute of limitations. In October 2002, AFC filed a motion for a summary judgment as well as a motion to amend the complaint to add a breach-of-contract claim. That same month, Lindsey was dismissed as a plaintiff, leaving AFC as the sole remaining plaintiff; in November 2002, the trial court dismissed the individual defendants, leaving only PWC as a defendant. Both PWC and AFC filed affidavits opposing the other party's summary-judgment motion in December 2002.
 "On January 7, 2003, the trial court granted PWC's summary-judgment motion. The trial court also denied AFC's motion for a summary judgment and AFC's motion to amend the complaint to include a breach-of-contract claim. AFC filed a timely notice of appeal to the Alabama Supreme Court. The Alabama Supreme Court transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975.
 "The action, as finally framed by both parties' pleadings, involved allegations by AFC asserting that PWC had improperly conducted its audits of AFC and had thereby allowed Davis, an officer of AFC, to engage in dishonest and fraudulent conduct in the operation of Dixieland Express, Inc. (`Dixieland'), a division of AFC. AFC asserted claims of negligence, fraud, and negligent supervision against PWC. PWC denied any *Page 699 
wrongdoing, specifically denying that any audits had been conducted improperly, and it argued that the two-year statute of limitations, codified at § 6-2-38(l), Ala. Code 1975, barred any claims by AFC on the basis of negligence, fraud, and negligent supervision.
 "¹ AFC dismissed PWC and hired another auditing firm to conduct future audits, after PWC completed an audit of AFC for the fiscal year ending on May 31, 1998.
 "² Pursuant to Rule 15(c)(2), Ala. R. Civ. P., AFC's claims related back to the date Lindsey filed his complaint against PWC."
911 So.2d at 690-91. After discussing the applicable standard of review, the Court of Civil Appeals further stated:
 "The record indicates that on September 1, 1998, PWC submitted to AFC its audit for AFC's fiscal year ending May 31, 1998. Moreover, the record also contains a July 1998 report to AFC's chief executive officer from PWC that specifically details a financial investigation undertaken by PWC to determine `the nature and extent of activities undertaken by . . . Davis to accelerate revenues and to delay expenses recognition during the fiscal year [that] ended May 31, 1998.' Additionally, PWC conducted an investigation to determine whether Davis misappropriated funds from AFC. The report concluded:
 "`Based on our conversations with Dixieland's leasing companies and truck vendors, we identified no other pending or completed transactions related to the lease or purchase of vehicles of which you [are] not aware.'
 "PWC noted that it did not perform a full audit or evaluation as part of its investigations into Davis's activities and that the investigations had been limited in scope to matters AFC had specifically requested that PWC investigate."
911 So.2d at 692-93.
With respect to AFC's fraud claim, the Court of Civil Appeals rejected AFC's argument that it had reasonably relied upon PwC's representations and was not aware of PwC's fraud and therefore the limitations period had not expired before it filed its action, in the following rationale:
 "Although AFC vigorously contends that before the spring of 1999, at the earliest, it was not on notice of any fraud allegedly perpetrated by PWC, the record does not support that contention. AFC fired Davis for misconduct in June 1998; PWC had submitted financial audits before 1998 that indicated no financial irregularities. In July 1998, PWC delivered a report to AFC that purported to outline the legality of Davis's activities. AFC argues that the audit submitted on September 1, 1998, and its background papers are the basis for AFC's allegations of fraud and fraudulent suppression. However, a party is deemed as a matter of law to have discovered a fraud upon either (1) the actual discovery of the fraud, or (2) when the party becomes privy to facts that would provoke inquiry in a reasonable person that, if followed up, would lead to the discovery of the fraud, whichever is earlier. Auto-Owners Ins. Co. v. Abston, 822 So.2d 1187, 1195 (Ala. 2001). The record clearly reveals that AFC knew of Davis's misconduct no later than June 1998. The fact that PWC's audits before the 1998 audit failed to disclose Davis's misconduct, coupled with the July 1998 PWC report indicating that PWC had not discovered any misconduct other than the misconduct that AFC was already aware of, would have provoked inquiry in a reasonable person to determine whether PWC had committed *Page 700 
fraud in connection to Davis's misconduct. AFC offered no substantial evidence that it reasonably relied on any misinformation given by PWC between the time AFC fired Davis in June 1998 and the time AFC intervened in this action in December 2000.
 "We conclude that AFC did not adduce substantial evidence of fraud or fraudulent suppression committed by PWC such that the statute of limitations would have been tolled in this case. Applying the test set forth in Kelly [v. Connecticut Mutual Life Insurance Co., 628 So.2d 454 (Ala. 1993)], we conclude that the trial court properly determined that the statute of limitations barred AFC's fraud and suppression claims."
911 So.2d at 693.
In her special writing concurring in part and dissenting in part, Presiding Judge Yates, joined by Judge Crawley, disagreed with the analysis of the fraud issue in the main opinion:
 "A review of the record provides substantial evidence from which the trier of fact could determine that PWC suppressed or concealed facts that would have delayed a reasonable person's (and, accordingly, AFC's) discovery of PWC's fraud. Generally, the question of when the statute of limitations begins to run is a question of fact for the jury. Barlow v. Liberty Nat'l Life Ins. Co., 708 So.2d 168 (Ala.Civ.App. 1997). In a fraud case, a jury question may exist regarding whether the statute of limitations was tolled where the plaintiff's ignorance of the contents of a document that would put a reasonable person on notice of a potential fraud is reasonable under the circumstances. Potter v. First Real Estate Co., 844 So.2d 540, 549 (Ala. 2002) (because of the special relationship of trust giving rise to a duty to disclose, a fact question existed as to whether there was a misrepresentation as to the contents of the purchase agreement or whether a trick or artifice was employed at the time of the closing, thus precluding a summary judgment in favor of the real estate agent as to the issue of whether the limitations period was tolled for claims of misrepresentation, fraud, and promissory fraud). A party's knowledge of documents that do not clearly indicate that a fraud has occurred may not trigger the statute of limitations. See Potter, supra.
 "AFC is a farmer's cooperative. In 1994, AFC decided to expand its services to the trucking industry, and it formed Dixieland Express, Inc. (`Dixieland'). AFC hired Davis to manage Dixieland. From 1994 to 1999, PWC provided accounting services for AFC and Dixieland. In June 1998, AFC terminated Davis's employment after it discovered that Davis had overstated revenue and had understated expenses by accruing accounts receivable and not recording accounts payable in the proper time period. At that time, AFC found that Davis had entered into tractor-trailer leases that had not been authorized by AFC's board of directors. AFC immediately informed PWC of the leases and relied on PWC to determine whether AFC's financial statements were accurate in light of the obligations incurred under the leases. PWC's audit work papers required PWC to examine lease agreements to determine the liability under those agreements and to determine whether the leases should have been capitalized. As late as September 1998, PWC submitted financial audits to AFC that indicated that there were no financial irregularities with regard to the lease expenses. However, in December 1998, Wells Fargo, one of the lessors, sued AFC for defaulting on payments due under the leases. On October *Page 701 
6, 2000, a shareholder of AFC, on behalf of AFC, sued PWC; AFC subsequently intervened in the action, asserting claims that were identical to the claims asserted on its behalf by its shareholder. A trier of fact could determine that the financial statements provided by PWC in September 1998 did not trigger the statute of limitations because a reasonable person would not have discovered PWC's alleged fraud until Wells Fargo brought its suit against AFC. See Ex parte Seabol, 782 So.2d 212 (Ala. 2000) (fact question existed regarding whether client's reliance on oral representations of his attorney and his banker regarding validity of the lien against the client's property was reasonable, thus precluding summary judgment on the basis of the statute of limitations as to client's fraud and suppression claims). If there is a genuine issue of material fact, the defendant is not entitled to a summary judgment. Id. Clearly, there was evidence from which a jury could determine that until Wells Fargo filed suit against AFC in December 1998, AFC was not on notice of PWC's alleged fraud."
911 So.2d at 695-96 (footnote omitted).
Our review of the record shows that AFC's June 2001 complaint alleged that AFC had specifically instructed PwC to audit AFC and specially to investigate Dixieland and Davis and that PwC had assured AFC that it had implemented controls that would prevent Davis from misappropriating any AFC funds. The complaint further alleges that after Davis was caught in his financial improprieties, PwC was specifically requested to investigate Davis and Dixieland's operations and its audit in that regard "came up clean." The business contracts between AFC and PwC indicate generally that PwC was to be AFC's principal business advisor and that PwC's audits were intended to allow it to accurately state AFC's financial position. PwC also indicated that it would update its accounting procedures and review AFC's internal bookkeeping to ensure the reliability of AFC's records. Among PwC's duties was the obligation to review lease agreements and to report on the financial effect of such agreements. William T. Bishop, a team leader and one of PwC's employees who performed its work for AFC, testified in his deposition that PwC would certainly disclose unauthorized or fraudulent practices in leases.
The record also contains evidence from the deposition testimony of Tommy Paulk, president of AFC, that AFC had authorized Davis, as the vice president of Dixieland, to acquire trucking equipment and to enter into equipment rentals under "short-term leases," i.e., leases with rental terms by the week or by the month. Davis was not authorized to enter into "long-term leases," i.e., leases with rental terms over a period of years. Paulk testified that he had discussed these limitations with Davis and had also discussed with Davis the fact that only Joe Lovvorn, chief operating officer of AFC, had the authority to enter into long-term leases. Davis was fired on June 19, 1998, for the specific reason that he had been using company checks to pay for personal purchases. Immediately after Davis's employment was terminated, Paulk discovered other irregularities indicating that Davis was falsely recording revenues and expenses. In addition to the accounting irregularities, on the day after Davis's employment was terminated Paulk discovered a number of unauthorized long-term leases that he recognized as creating "a problem." AFC then informed PwC about those leases and sought its investigation of AFC's financial position in light of the unauthorized leases. Paulk also testified that AFC began to contact the companies with whom AFC had executed the leases *Page 702 
in an attempt to "extricate ourselves from the leases." Paulk testified that AFC was able to terminate some of the unauthorized leases in this fashion, but he also stated that some of the parties to the leases were not cooperative. Paulk stated that he contacted Bishop and requested a "forensic" team to evaluate the problems arising from Davis's employment, including the unauthorized leases.
The record shows that the PwC audit delivered to AFC in September 1998, after AFC had disclosed to PwC the unauthorized leases executed by Davis and in response to AFC's request that PwC investigate the effect of those leases on AFC's financial position, did not alert AFC to any obligation resulting from those leases. PWC's working papers concerning its audit stated, in pertinent part:
 "After the May 31, 1998 closing, it was discovered that the Transportation VP [Davis] was overstating revenue and understating expense by accruing receivables and not recording payables in the proper period. The VP was terminated, and PWC Atlanta (FAS-Litigation Claims Services) conducted an investigation during the month of July 1998. No other improprieties affecting the May 31, 1998 financial statements have come to our attention as a result of the investigation. (Note: the field team leader for the AFC engagement was part of the investigation team.) All account balances have been adjusted to correct for the improper activity. During our investigation, PWC performed testing of sales cutoff and agreed the total sales per the adjusted income statement to the sum of monthly sales registers (used for our cutoff testing). PWC also performed extensive testing of the lease/rental expense for the fiscal year ending May 31, 1998, and a review of vendors and recurring payments was conducted.
 "We will complete a search for unrecorded liabilities as part of our overall audit.
"Conclusion:
 "Based on the special project completed by PWC FAS (based in Atlanta), all accounts appear to be properly adjusted and stated at 5/31/98. No additional items relating to the termination came to our attention during our year-end work."
Further, AFC's financial statement for 1998 as audited by PwC did not show any financial obligation on AFC's part under long-term leases. Bishop testified that PwC's investigation did not find any misstated accounts, but he also stated that he did not know whether the leases in question were examined and that "the audit process is based on our judgment."
Thus, the record shows that AFC discovered Davis's misconduct, that it informed PwC of that misconduct, and that it requested that PwC investigate the misconduct, specifically including the financial effects of the unauthorized long-term leases. PwC subsequently issued an audit report that indicated that AFC had no long-term obligations under the unauthorized leases even though PwC had apparently not reviewed those leases. The critical question is whether, under those circumstances, AFC acted reasonably in relying on PwC's audit report showing that it had no obligations under the leases or whether AFC should have known that PwC had not examined the unauthorized leases in conducting the audit. We conclude that the record does present a genuine issue of material fact as to whether AFC could have reasonably relied on PwC's September 1998 audit, which served to allay any suspicion that PwC might itself be suppressing information as to any failures in its service with respect to the effect of the *Page 703 
unauthorized leases. If AFC's reliance on PwC's audit was reasonable, then it would not have had notice that in preparing the financial statement PwC disregarded the effect of the leases until AFC was sued on its obligations under the leases in December 1998, and its fraud claim was filed within the limitations period. Judge Yates's citation to Barlow v. LibertyNational Life Insurance Co., 708 So.2d 168 (Ala.Civ.App. 1997), in her legal analysis of when the limitations period for fraud is tolled under circumstances analogous to this case is also appropriate. That analysis in Barlow states:
 "The statute of limitations for fraud claims is two years. § 6-2-38(l), Ala. Code 1975. However, the statute of limitations for a fraud claim does not begin to run until the fraud is discovered, or should have been discovered. § 6-2-3, Ala. Code 1975; Kelly v. Connecticut Mutual Life Ins. Co., 628 So.2d 454
(Ala. 1993). The question of when a party discovered, or should have discovered, the fraud is a question for the jury. Kelly. The question of when a plaintiff should have discovered the fraud is taken away from the jury and is decided as a matter of law only in cases where the plaintiff actually knew of facts that would have put a reasonable person on notice of the fraud. Id."
708 So.2d at 173-74.
The statute of limitations is tolled as to a fraud claim if, after discovery of the fraudulent act and inquiry, the plaintiff is misinformed or falsely informed by the defendant and the plaintiff reasonably relies on the defendant's misrepresentation.Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala. 1997).
The application of this test to the facts in this case requires the conclusion that the summary judgment on AFC's fraud claim was incorrect. Accordingly, we reverse the judgment of the Court of Civil Appeals insofar as it affirmed the summary judgment on that claim, and we remand the cause to that court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.