On Second Application for Rehearing

PER CURIAM.
This Court’s no-opinion order of affir-mance of April 19, 2013, is withdrawn, and the following is substituted therefor.
Target Media Partners Operating Company, LLC (“Target Media”), and Specialty Marketing Corporation d/b/a Truck Market News (“Specialty Marketing”), both publishers of magazines directed to long-haul truck drivers and to the truck-driving industry, have litigated a commercial-contract dispute since 2007 in which each party alleged breach-of-contract claims against the other. Specialty Marketing, a plaintiff in the trial court, also alleged fraudulent-misrepresentation and promissory-fraud claims against Target *848 Media and Ed Leader, Target Media’s vice president of trucking, and sought punitive damages in addition to compensatory damages. The litigation culminated in a jury trial that lasted several days. The jury returned a verdict in favor of Specialty Marketing on its breach-of-contract and promissory-fraud claims against Target Media, in favor of Leader on the promissory-fraud claim against him, in favor of Specialty Marketing on its fraudulent-misrepresentation claim against Target Media and Leader, and in favor of Target Media on its breach-of-contract counterclaim against Specialty Marketing. Target Media and Leader appeal from that aspect of the judgment entered on the jury verdict in favor of Specialty Marketing on its claims against Target Media and Leader. Specialty Marketing does not appeal the judgment insofar as it found in favor of Target Media on Target Media’s counterclaim. We affirm the trial court’s order denying Target Media’s and Leader’s post-judgment motion, but we remand the cause to the trial court to review the punitive-damages award.
I. Factual Background and Procedural History
Target Media, which sometimes does business as “Target Distribution Partners” or “Target Media Partners,” publishes a number of magazines that contain advertisements for items of interest to truck drivers and the trucking industry, such as driver recruitment and sales of commercial trucks and products used by truck drivers. It distributes the magazines nationally to truck stops, rest stops, and similar locations frequented by truck drivers. These magazines are free of charge. Target Media has a major distribution hub for these magazines in Oxford.
Specialty Marketing also publishes a free magazine directed to the truck-driving industry called Truck Market News that is published monthly and that contains advertisements for products such as new and used commercial trucks, parts, and trailers. Specialty Marketing distributes Truck Market News to many of the same locations where Target Media distributes its magazines. Specialty Marketing is a family business headquartered in Dallas, Texas, that has been in operation for over 35 years. It is run by Terry W. Davis and his sister, Kathleen Daniels, who have continued the business started by their father and who together own all the stock in Specialty Marketing.
In 2000, Target Media purchased two businesses in Calhoun County, Pollard Publishing and J.B. Scott, that published free magazines for distribution to truck drivers. Target Media then employed Gordon Adams and his brother Wallace Adams, both of whom had formerly worked for Pollard Publishing. After the purchases, Leader relocated to Oxford where, in addition to heading the trucking division of Target Media, he was also in charge of the distribution hub the company operated in Oxford.
In the fall of 2002, Jack Humphreville, Target Media’s vice president of acquisitions, contacted Davis to discuss whether Davis and Daniels would be interested in selling Specialty Marketing to Target Media. When Davis and Daniels decided against selling Specialty Marketing, Davis and Humphreville began to discuss a business venture between the companies pursuant to which Target Media would distribute Truck Market News for Specialty Marketing. Davis testified that Humphre-ville told him he felt that Specialty Marketing could increase its advertising revenue by 20% annually if it used Target Media’s distribution services. Humphre-ville put Davis in touch with Gordon Adams, who was at that time Target Media’s distribution manager in Oxford, and *849 Davis and Gordon Adams negotiated a contract they executed on November 21, 2002 (“the 2002 distribution contract”). However, Gordon Adams testified that he had to obtain the approval of Ed Leader, the vice president of trucking, of the terms of the 2002 distribution contract before it could be executed.
The contract stated:
“Target Distribution Partners (TDP) is pleased to bid' on delivery of Truck Market News. TDP has carved out a niche in the highly competitive truck stop delivery market because of our High Response Delivery System. As such, TDP can help you maximize your advertising, marketing, and magazine movement needs by:
“Hand Delivery and display nationwide
“Documentation that includes proof of delivery, returned (non-picked up) magazines, store stamps and photos upon request
“Delivery twice a month
“Guaranteed prominent display at each location
“Use of Target Media Partners Circulation, Sales and Distribution program (TMPCSD) for hand delivery locations only
“We have priced our delivery services of Truck Market News on a per stop basis. This price includes all slotting fees and hand delivery. This price also includes distribution in our racks and four quad boxes. The price does not include any costs associated with shipments of your product to our warehouses. This will also afford you the same cost even when your magazine adds more pages. We believe that this all-inclusive pricing structure is easier to understand than a structure based on price per pound plus various add-ons.
‘Tour price structure is identified on Exhibit A attached hereto.
“The above is contingent on your gaining approval, if necessary, from each Truck Stop chain or location. We will be glad to assist you in gaining these approvals.
“As a partner with TDP, you will be able to use our proprietary TMPCSD software program to further enhance the benefits of our High Response Delivery System. With the help of the information provided by TMPCSD, you are able to adjust various parameters (such as the number of [magazines] placed at individual locations and the return factor) that influence the draw algorithm, which in turn helps you improve or optimize the number of [magazines] that you print. This can result in savings or better utilization of your printing dollars. This service is unmatched by any other truck stop distribution company.
“Truck Market News agrees to supply TDP’s warehouses with the magazines in a form and time acceptable to TDP. TDP’s delivery cycle begins on the 28th and 15th of each month and all shipments must be in our warehouses by those dates.
“Truck Market News agrees to pay for all deliveries and services provided for or paid for by TDP within 10 days upon receipt of invoice. We anticipate a monthly billing cycle.
“Truck Market News agrees to endorse TDP as its recommended Delivery Company for Truck Market News and agrees to let TDP advertise Truck Market News as a preferred customer. Truck Market News agrees not to use any misleading statements to customers, that may confuse or misrepresent the actual duties performed for Truck Market News, by TDP.
*850 “Either party for any reason upon 60 days prior written notice may amend by agreement of both parties or terminate this agreement.
“This contract is subject to periodic review for customer compliance.
“We want to be more than a delivery company for you. We want to be a business partner. One that delivers your product, gives you accesses [sic] to thousands of locations and gives you accurate information to help you optimize your printing and distribution costs.
[[Image here]]

“Exhibit A

“Location # of Locations Pocket Rate Monthly Cost
$1,485 Petro Shopping Centers LO LO ⅞¾-to
$2,915 “Travel Centers of America LQ LQ ⅛⅝ CO
$1,845 “Williams Travel Centers LO ■⅝⅛! ⅛⅞-
$1,435 “AMBEST LO CO -ee-
Independent Truck Stops 113 $25 $2,825
“Total : 275 $10,505”
The 2002 distribution contract was signed by Gordon Adams as “General Manager” of “Target Distribution Partners” and by Davis as the “Publisher” of “Truck Market News.” The parties subsequently agreed to adjust the total paid to Target Media per month by Specialty Marketing from $10,505 to $9,750. ; ,
The monthly delivery process under the 2002 distribution contract began when Trend Offset Printing (“Trend”) in Dallas printed the magazines published by Target Media and Specialty Marketing. Trend printed between 36,000 and 42,000 copies of Truck Market News each month. Trend shipped most of Target Media’s magazines and approximately 7,500 copies of Truck Market News to Target Media’s Oxford facility. A certain number of both Target Media’s magazines and Truck Market News were shipped directly from Trend to more than 60 terminals and warehouses operated by Con-way, Inc., nationwide for the delivery drivers’ use in restocking along their routes. Davis himself picked up several hundred copies of Truck Market News and delivered those to small “mom-and-pop” truck stops in the area around Dallas that were not covered by Target Media’s delivery routes. The remainder of Target Media’s magazines and Truck Market News remained at Trend for route delivery. Target Media contracted with an independent driver in Dallas, Bonnie Hargis, to pick up and distribute those magazines. Hargis employed additional personnel to assist her in picking up and delivering the magazines. They all made several trips to Trend each month to load all the magazines they were employed to deliver.
When a monthly shipment from Trend was received at Target Media’s Oxford facility, the magazines were unloaded at the warehouse. Thereafter, the process ■ called for Target Media’s delivery drivers to pick up the various magazines, load their vehicles, and deliver the magazines to the stops on each delivery route, where they placed the various magazines into *851 display racks located at each stop. Some drivers made multiple trips to the Oxford warehouse to pick up magazines for delivery. A certain number of magazines were left at the warehouse for the drivers to pick up in the middle of the month when they traveled their routes a second time to restock. At the beginning of the next month, the drivers would remove any copies of the previous month’s magazines remaining in the racks on their routes and replace them with current magazines, then dispose of the old magazines. The drivers were not allowed to return any of the previous month’s magazines to the warehouse.
Several former Target Media employees at the Oxford facility testified in the trial. Gordon Adams, who was ultimately in charge of magazine distribution in Oxford, in Dallas, and at the Con-way locations, worked for Target Media from 2000 until September 2004. Wallace Adams took over for his brother as acting manager of distribution until January 2006,-when Target Media decided against promoting Wallace Adams to the manager’s position and hired someone else for the job. Tommy Fowler also worked in Oxford for Target Media as its audit manager.
These three former Target Media employees testified that Target Media did not comply with the delivery requirements of the 2002 distribution contract from the beginning. Gordon Adams, Wallace Adams, and Fowler all testified that Target Media discarded most of the Truck Market News magazines before the magazines were ever loaded onto Target Media’s delivery trucks and vans. Often, they stated, the magazines that were thrown away were still in the plastic wrap in which they had been delivered from Trend, with the bands holding bundles of magazines still in place. Occasionally whole pallets of Truck Market News magazines were taken to a nearby recycling plant without being unloaded at the Oxford facility at all. Gordon Adams, Wallace Adams, and Fowler also testified that when Target Media’s delivery personnel picked up magazines for distribution, they were under company orders to load all of Target Media’s magazines into their delivery vehicles first and to load magazines delivered for other companies, such as Truck Market News, only if there was room in the vehicle • after Target Media’s magazines were loaded. The three former Target Media employees testified that often there was no room left in the delivery vehicles for any magazines other than the ones published by Target Media, so other magazines were simply thrown away or delivered to the recycling plant.
Furthermore, testimony reflected that Target Media had prepared a schematic for its employees directing the placement of magazines in the racks at its delivery destinations. In many instances, the racks had room for only Target Media magazines, so the magazines for which there was no room in the racks were thrown away at the truck stops or other delivery points. Gordon Adams, Wallace Adams, and Fowler all testified that they knew it was wrong to dispose of new magazines before delivery had ever been attempted but that they followed orders from Leader in order to keep their jobs. They testified that, at times, approximately 90% of the copies of Truck Market News that were shipped to the Oxford facility were thrown away at the beginning of the month, meaning that only 10% of the magazines shipped to Oxford were delivered to Specialty Marketing’s intended readers.
Glynis Ford, a former clerical employee with Target Media, testified that her job was to enter figures from the delivery drivers’ route sheets into Target Media’s computer system. For each magazine ti- *852 tie, the drivers were supposed to note on their route sheets the number of magazines loaded for delivery at the first of the month, the number restocked at the middle of the month, and the number of undelivered magazines (“returns”) disposed of at the end of the month. Ford testified that she was ordered by Leader and her other superiors at Target Media to make up numbers if the drivers had not supplied numbers. She said she was instructed to supply numbers that would make the delivery and return results “look good.” Ford further testified that falsifying numbers for the reports “bothered” her but that she needed her job and therefore did what she was told.
From February 2003 through August 2004, Target Media provided Specialty Marketing with spreadsheets that contained delivery data for Truck Market News from the Oxford facility. The spreadsheets were designed to report the locations to which Truck Market News was delivered, the total number of magazines delivered to each location, and the total number of returns at the end of the month. It was undisputed that disposing of the returns was proper procedure because once a new monthly magazine was published, the previous month’s publication was no longer of any use. It was also undisputed, however, that disposing of new magazines, still banded and encased in plastic, was highly improper. Davis testified that one of the reasons he agreed to pay Target Media to deliver Truck Market News was its promise that it would report the number of deliveries and returns to him so that he could maximize his printing costs, having more magazines shipped to locations where they moved well and fewer delivered to locations where more magazines were returned at the end of the month. Davis testified that, during the time he was receiving the spreadsheets, he was not aware that most of the numbers in the reports had been fabricated by the Target Media employees in Oxford.
Steve Burt was employed by Target Media from the fall of 2002 until February 2007, when he resigned to deliver Truck Market News for Specialty Marketing. Burt had taken photographs at Target Media’s request during his delivery routes, which the company used as proof of magazine delivery and as a method to audit its drivers by reviewing photographs taken of magazines placed in the display racks. Burt initially purchased disposable cameras but later began taking the photographs with a digital camera. At some point, Burt began to photograph various new magazines, including Truck Market News, that were being thrown into dumpsters or left on the loading dock of a nearby recycling plant. Sometime in late 2006, Burt learned from Hargis that Davis had asked her to check the racks in the truck stops on her delivery routes in Dallas and to let him know if a magazine published by a competitor other than Target Media was replacing Truck Market News in the racks. She contacted Burt because she thought he might have some photographs that would shed light on the problem.
In January 2007, Burt traveled to Dallas to meet with Davis and Daniels. Burt testified that he told them that the competitor’s magazine was not their problem but that Target Media was. Burt showed Davis and Daniels his photographs of the magazines that were being thrown away every month at Target Media, including numerous photographs depicting packages of Truck Market News, still banded and wrapped in plastic, on the warehouse docks at Target Media, in dumpsters, and at the recycling facility that accepted many of Target Media’s magazines for disposal. He admitted to Davis and Daniels that he was guilty of throwing away their new *853 magazines and told them that only a small percentage of Truck Market News shipped to the Oxford facility was being delivered by Target Media drivers. After this meeting, Davis decided to end his contract with Target Media, and he hired Burt to deliver his magazines. On January 19, 2007, Specialty Marketing and Burt executed a three-year contract under which Burt agreed to deliver Truck Market News for $9,500 per month.
Davis testified that he and Daniels were stunned and shocked when they talked with Burt and saw his photographs. They knew that their business had not sustained the growth Humphreville had estimated they would see if they employed Target Media to deliver Truck Market News but had not realized that only a small percentage of their magazines entrusted to Target Media in Oxford were being delivered. Davis testified not only as to the money Specialty Marketing had paid Target Media for delivery of copies of Truck Market News that were instead being thrown away, but also as to the monthly cost of printing Truck Market News and the monthly delivery fees necessary to have thousands of copies of the magazine delivered to Target Media’s Oxford facility. Davis calculated that Specialty Marketing had paid Target Media approximately $430,000 in fees under the 2002 distribution contract and that Specialty Marketing had incurred over $900,000 in printing costs from December 2002 through January 2007 for magazines most of which had been discarded.
On October 5, 2007, Specialty Marketing, Davis, and Daniels sued Target Media,[1] Leader, Gordon Adams, Wallace Adams, Fowler, and Paul Bannister (a former manager with Target Media), alleging breach of contract, promissory fraud, intentional interference with business relations, negligence and wantonness, and fraudulent misrepresentation. Specialty Marketing, Davis, and Daniels sought punitive damages as well as compensatory damages in their complaint. Target Media later filed a counterclaim against Specialty Marketing, alleging breach of contract and money owed on an open account.
Shortly after litigation began, Specialty Marketing, Davis, and Daniels dismissed Bannister as a defendant. All remaining parties actively pursued their claims and engaged in extensive discovery. They also filed summary-judgment motions, but the trial court denied all of those motions. Before trial, the trial court dismissed Davis and Daniels as plaintiffs and dismissed Specialty Marketing’s claims alleging negligence and wantonness and intentional interference with business relations. The case proceeded to a jury trial beginning on May 3, 2010, on Specialty Marketing’s breach-of-contract, promissory-fraud, and fraudulent-misrepresentation claims and on Target Media’s counterclaim. During the trial, the court dismissed Gordon Adams, Wallace Adams, and Fowler as defendants. Target Media and Leader moved for a judgment as a matter of law (“JML”) as to Specialty Marketing’s claims at the close of Specialty Marketing’s evidence, and all parties moved for a JML at the close of all the evidence. The trial court prepared separate verdict forms that required the jury to make a determination of liability as to each of Specialty Marketing’s claims — breach of contract against Target Media, promissory fraud *854 against Target Media, promissory fraud against Leader, fraudulent misrepresentation against Target Media, and fraudulent misrepresentation against Leader, and as to Target Media’s claims — breach of contract and open account against Specialty Marketing. The forms required the jury to return a separate compensatory-damages award for each claim and counterclaim and allowed the jury to award punitive damages to Specialty Marketing as to its promissory-fraud and fraudulent-misrepresentation claims if the jury found such damages appropriate.
The jury returned verdicts in favor of Specialty Marketing on its breach-of-contract claim, awarding compensatory damages of $851,552; in favor of Target Media on its breach-of-contract counterclaim, awarding compensatory damages of $48,800; in favor of Specialty Marketing and against Target Media on Specialty Marketing’s promissory-fraud claim, awarding compensatory damages of $210,000 and punitive damages of $630,000; in favor of Leader on Specialty Marketing’s promissory-fraud claim; and in favor of Specialty Marketing and against Target Media and Leader on Specialty Marketing’s fraudulent-misrepresentation claim, awarding compensatory damages of $167,800 and punitive damages of $503,400.
The trial court entered a judgment on the verdicts on May 13, 2010. On June 11, Target Media filed a postjudgment motion to alter or amend the judgment to reflect its correct corporate name, Target Media Partners Operating Company, LLC, instead of “Target Media” as the judgment referred to it. On June 14, Target Media and Leader filed a postjudgment motion renewing their motion for a JML and requesting a new trial and/or a remittitur; in addition, they filed a separate motion on June 14 asking the court to allow them to submit their financial statements under seal. On August 30, the trial court entered an order amending the judgment to reflect the correct corporate name for Target Media. Also on August 30, the trial court entered an order denying the post-judgment motion for a JML, new trial, and/or remittitur filed by Target Media and Leader. On September 2, Specialty Marketing filed'a motion asking the trial court to amend its August 30 order denying Target Media and Leader’s post-judgment motion to state the factors the court considered when it denied the motion. On September 7, Target Media and Leader filed a response to Specialty Marketing’s motion in which they “again requested] a hearing on their post trial motions including all hearings required by Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986) and Alabama Code [§ ]6— 11-23 (1975).” On September 13, the trial court set all pending motions for a hearing on November 9.[2] On September 21, Target Media and Leader appealed. Specialty Marketing did not cross-appeal from the judgment against it on Target Media’s counterclaim.[3]
II. Standard of Review
A. Motion for a JML
“When reviewing a ruling on a motion for a JML, this Court uses the *855 same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).
B. Motion for a New Trial
“In discussing the standard of review in an appeal from a judgment based on a jury verdict where the trial court has denied a motion for a new trial, this Court has stated:
“ ‘ “Jury verdicts are presumed correct, and this presumption is strengthened by the trial court’s denial of a motion for a new trial. Therefore, a judgment based on a jury verdict will not be reversed unless it is ‘plainly and palpably’ wrong.” ’
“Tanksley v. Alabama Gas Corp., 568 So.2d 731, 734 (Ala.1990) (quoting Davis v. Ulin, 545 So.2d 14, 15 (Ala.1989)).”
Petty-Fitzmaurice v. Steen, 871 So.2d 771, 773 (Ala.2003).
III. Analysis
We first address Specialty Marketing’s argument that Target Media and Leader’s appeal should be dismissed as being from a nonfinal judgment. We then address whether the trial court properly denied Target Media and Leader’s postjudgment motion.
A. The Judgment
Specialty Marketing argues that the trial court’s August 30, 2010, order denying Target Media and Leader’s post-judgment motion was not a final order because, it argues, the August 30 order did not completely adjudicate all matters in controversy between the parties. Therefore, Specialty Marketing argues, because the appeal is taken from a nonfinal judgment, this Court should dismiss the appeal. In response, Target Media and Leader argue that the August 30 order was final and that they filed a timely notice of appeal within 42 days of the issuance of the August 30 order. We agree.
The trial court entered a judgment on the jury’s verdicts on May 13, 2010. On June 14, Target Media and Leader filed a timely postjudgment motion pursuant to Rules 50(b) and 59(a) and (f), Ala. R. Civ. P., renewing their motion for a JML, requesting a new trial, and/or requesting a remittitur of the punitive-damages awards. They also filed a separate motion to allow them to submit their financial statements under seal. Target Media and Leader requested a hearing on their postjudgment motion, and the portion of the motion re *856 questing a remittitur specifically included a request for a hearing on the issue of punitive damages pursuant to this Court’s decisions in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). According to Rule 4(a)(3), Ala. R.App. P., such a postjudgment motion suspends the time in which a party must appeal from a final judgment:
“The filing of a post-judgment motion pursuant to Rules 50, 52, 55 or 59 of the Alabama Rules of Civil Procedure ([Ala. R. Civ.P.]) shall suspend the running of the time for filing a notice of appeal. In cases where post-judgment motions are filed, the full time fixed for filing a notice of appeal shall be computed from the date of the entry in the civil docket of an order granting or denying such motion.... ”
When the trial court entered its order on August 30 denying Target Media and Leader’s postjudgment motion, they then had 42 days from August 30 in which to appeal.
Even though the trial court’s order of August 30 disposed of all motions then pending, Specialty Marketing filed a motion on September 2 asking the trial court to amend its August 30 order to state the factors on which the court relied in denying the postjudgment motion. Then, on September 7, Target Media and Leader renewed their motion for a hearing on their postjudgment motion, including a Hammond/Green Oil hearing on punitive damages. Specialty Marketing relies on the pendency of these two motions in arguing that the August 30 order was not final. Specialty Marketing also argues that Target Media’s June 14 motion seeking to file its financial records under seal remained pending after the trial court entered its August 30 order because, it argues, it is not the kind of motion that can be denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. Because these three motions were still pending, Specialty Marketing argues, the August 30 order was not final because, it says, the trial court did not “completely adjudicate all matters in controversy between the parties.” Specialty Marketing’s brief, at 28.
This Court considered a similar situation in Southeast Environmental Infrastructure, L.L.C. v. Rivers, 12 So.3d 32 (Ala.2008). In that case the losing party at trial, Southeast Environmental Infrastructure (“SEI”), filed a postjudgment motion together with a motion for a remittitur and requested a Hammond/Green Oil hearing. The trial court scheduled a hearing, but informed the parties that it would consider all other postjudgment motions at the hearing and that it would schedule another hearing on the motion for a remittitur. Instead, the trial court entered an order denying SEI’s postjudgment motions for a new trial, a JML, and a remittitur. The winning party, Rivers, then filed a motion for the court to hold a hearing on SEI’s remittitur motion. SEI opposed Rivers’s motion, arguing that the trial court’s denial of its postjudgment motions left the trial court without jurisdiction to hold a hearing on its motion for a remittitur. SEI contended that its only remedy was to appeal the order denying its postjudgment motions. The trial court rejected SEI’s arguments and held that SEI had waived its right to a remittitur hearing or had invited any error resulting from the absence of such a hearing. This Court agreed with SEI that, after the trial court denied SEI’s postjudgment motions, the trial court “lost jurisdiction to ‘reconsider’ those post-judgment motions.” 12 So.3d at 49. The Court continued:
“In Ex parte Allstate Life Ins. Co., 741 So.2d 1066, 1070 (Ala.1999), this Court stated:
*857 [[Image here]]
“ ‘... This Court has clearly-warned the bench and the bar not to attempt to use a Rule 59 or Rule 60 motion as a substitute for an appeal. “In view of the fact that this case presents to us that situation, we take this opportunity to point out to the bench and bar that the Rules of Civil Procedure do not authorize a movant to file a motion to reconsider the trial judge’s ruling on his own post-judgment motion.” [Ex parte Dowling,] 477 So.2d [400,] 404 [ (Ala.1985) ]. Just recently, this Court has reiterated: “[I]f a party has his own post-judgment motion denied, the review of that denial is by appeal. The rules do not provide for a ‘motion to reconsider’ the denial of one’s own post-judgment motion.” Ex parte Mutual Savings Life Ins. Co., [765 So.2d 649, 651 (Ala.1998) ].
“‘The Court of Civil Appeals has also stated that the rule that a trial court cannot entertain a motion to “reconsider” its previous order denying a post-judgment motion is more than a mere “technicality” under the Alabama Rules of Civil Procedure, but is based on the court’s loss of jurisdiction over the case. Package Express Center, Inc. v. Motley, 717 So.2d 378 (Ala.Civ.App.1998).’
“See also Pinkerton Sec. & Investigation Servs., Inc. v. Chamblee, 961 So.2d 97, 101-02 (Ala.2006), in which this Court stated:
“ ‘A motion to reconsider the trial court’s denial of a postjudgment motion is barred because after the denial the trial court loses jurisdiction over the action. Ex parte Allstate Life Ins. Co., 741 So.2d 1066, 1070 (Ala.1999)
“ ‘Thus, “ “when a post-judgment motion is denied, the review of that denial is by appeal, not by a motion to reconsider.’ ” Ex parte Mutual Sav. Life Ins. Co., 765 So.2d 649, 651 (Ala.1998) (quoting McAlister v. Deatherage, 523 So.2d 387, 389 (Ala.1988)).’
“Accordingly, SEI was correct in arguing that, after its December 11, 2006, order denying the postjudgment motions, the trial court did not have jurisdiction to hold a hearing on SEI’s motion for a remittitur.”
12 So.3d at 49-50 (footnote omitted).
Applying Southeast Environmental Infrastructure to the facts of this case, we conclude that, after the trial court entered its order of August 30, 2010, it lost jurisdiction over the case. The motions filed on September 2 and September 7 by Specialty Marketing and Target Media, respectively, were, in effect, motions to “reconsider” and were therefore ineffective. Furthermore, the trial court had no authority to enter the order of September 13 purporting to schedule a hearing on the remittitur motion. The August 30 order denying Target Media and Leader’s postjudgment motions was clearly a final order, and Target Media and Leader properly filed their notice of appeal. We conclude that the notice of appeal filed on September 21 was timely and that this appeal was taken from a final judgment.
B. Breach of Contract
Target Media first argues that it did not breach the 2002 distribution contract. In order to establish that the breach of contract alleged in its complaint occurred, Specialty Marketing' needed to prove “‘(1) the existence of a valid contract binding the parties in the action, (2) [Specialty Marketing’s] own performance under the contract, (3) [Target Media’s] nonperformance, and (4) damages.’ ” Employees’ Benefit Ass’n v. Grissett, 732 *858 So.2d 968, 975 (Ala.1998) (quoting Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98, 99 (Ala.1995) (citations omitted)).[4]
As to the first element, it is undisputed that a valid contract — the 2002 distribution contract — existed. Under the contract, Target Media agreed to:
• Hand deliver the magazine Truck Market News and display it nationwide.
• Provide documentation (proof of delivery, magazines not picked up, etc.).
• Deliver the magazine twice a month to approximately 275 locations.
• Prominently display the magazine at each location.
• Allow Specialty Marketing to use a proprietary software program to enhance the benefits of Target Media’s “High Response Delivery System.”
Under the contract, Specialty Marketing agreed to:
• Deliver magazines to Target Media’s warehouses (7,500 to the Oxford facility, remainder stayed in Dallas).
• Pay Target Media $9,750 per month for delivery services.
The written contract was offered in evidence, and the jurors were able to read the contract for themselves.
As to the second element, Specialty Marketing produced copies of the checks by which it paid for Target Media’s delivery services from 2002 through most of 2006, from which the jury could have concluded that Specialty Marketing proved its performance under the contract, except for approximately five months when Specialty Marketing did not pay the invoices from Target Media.
As to the third element, Specialty Marketing’s witnesses testified as to the destruction of large numbers of new magazines published by Specialty Marketing, as to Target Media’s orders to its delivery drivers that Truck Market News was to be loaded and delivered only if there was room left in their vehicles after Target Media’s magazines had been loaded, and as to Target Media’s schematics of the display racks that left no room for Truck Market News. Specialty Marketing presented photographs of magazines still banded and encased in plastic that had been thrown into dumpsters or taken to a recycling plant and presented Ford’s testimony that she “made up” the numbers necessary to complete distribution reports that were forwarded to Specialty Marketing. Target Media introduced testimony that Gordon Adams and Wallace Adams were responsible for the destruction of magazines and explaining the instructions to Target Media employees to invent numbers for reports and Leader’s testimony that he never ordered employees to destroy new magazines. Target Media attacked Burt, portraying him as an opportunist who staged the photographs he showed Davis and Daniels in order to obtain a lucrative delivery contract for himself and emphasizing his admission that he had destroyed thousands of copies of Truck Market News. The jury had ample evidence from which it could have determined either that the Adams brothers, Fowler, and Burt were credible witnesses or that Leader was a credible witness. The jury apparently believed Specialty Marketing’s witnesses and determined that Target Media had failed to perform under the 2002 distribution contract.
*859 Finally, as we will discuss hereinafter, the jury heard ample evidence from which it could have found harm to Specialty Marketing as a result of the breach of contract. Therefore, the trial court properly submitted Specialty Marketing’s breach-of-contract claim, based on an alleged breach of the 2002 distribution contract, to the jury. Moreover, after reviewing the terms of the 2002 distribution contract and the evidence presented at trial, we find substantial evidence from which the jury could have found that Target Media breached the contract.
Target Media next notes that the trial court instructed the jury, without objection, that Specialty Marketing claimed a breach of contract because, Target Media says, “all” the copies of Truck Market News were not delivered each month. Target Media then argues that Specialty Marketing did not prove a breach of contract because, it argues, Davis testified that, under the 2002 distribution contract, he did not, in fact, expect Target Media to deliver “all” the copies of Truck Market News. Target Media contends that unchallenged jury instructions become the law of the case, citing Louisville & Nashville R.R. v. Atkins, 435 So.2d 1275, 1278-79 (Ala.1983), and that the jury must follow the trial court’s instructions even if they are erroneous, citing Lee v. Gidley, 252 Ala. 156, 157-58, 40 So.2d 80, 82 (1949).
In response, Specialty Marketing argues that it presented overwhelming evidence that Target Media breached the 2002 distribution contract and that Target Media is wrong when it argues that the trial court’s use of the word “all” in its jury instruction means that Specialty Marketing could not prove a breach of contract. Citing Treadway v. Brantley, 437 So.2d 93, 97 (Ala.1983), Specialty Marketing says that Target Media’s argument “ignores the record and unjustly twists a part of the larger set of jury instructions which must be read and considered in their entirety.” Specialty Marketing’s brief, at 48.
The trial court charged the jury as follows:
“Now, ladies and gentlemen, ... the first charge in the complaint is that for breach of contract. So let me talk to you for a minute about breach of contract.
“Now, .,. the plaintiff in this case, Specialty Marketing, has said ... that Specialty Marketing and the defendant, which is Target Media, entered into a contract for the distribution of Truck Market News, the magazines.
“And the plaintiff in this case, Specialty Marketing, says that the defendant, Target Media, breached or broke this contract by failing to deliver all of the magazines. The defendant in this case, which is Target Media, denies these claims.
“Now, the contract, what is a contract and what are the elements of a contract? The plaintiff here ... says that the parties had a contract and the contract is simply an agreement to do or not do a certain thing. Here it was a contract to do a certain thing which we’ve talked about[;] the contract ] [has] been introduced. You can look at that.
“In this action, Specialty Marketing claims damages of Target Media that result [from] a breach of contract that was entered into by Specialty Marketing and Target Media on November 21, 2002, whereby Specialty Marketing agreed to provide its magazines for delivery and pay $9,750 per month to Target Media for this service. Target Media agreed to deliver the magazines to 275 locations.
*860 “Specialty Marketing contends that it has performed its part of the contract but that Target Media has breached the contract by failing to deliver all the magazines. Specialty Marketing alleges it was damaged as a result of the breach.
“Target Media admits entering into the contract with Specialty Marketing, but in defense of Specialty Marketing’s claim, contendfe] that Specialty Marketing should not recover beeaúse Target Media delivered Specialty Marketing’s magazines pursuant to the terms of the contract.
“Additionally, Target Media has filed a counterclaim against Specialty Marketing whereby Target Media seeks damages from Specialty Marketing as a result of Specialty Marketing’s failing to pay for that delivery.
“The contract, being admitted by both parties, it will be your duty to determine from the evidence whether either party breached the contract, and if so, the amount of damages, if any, suffered by the other party as a result thereof.
“Now, a contract is breached or broken when a party does not do what was promised to do in the contract. To recover damages from the defendant in this case, from Target Media, for breach of contract, Specialty Marketing must prove to your reasonable satisfaction all the following:
“That Specialty Marketing and Target Media entered into a contract;
“That Specialty Marketing did all the things that the contract required [it] to do;
“That Target Media failed to do the things that the contract required [it] to do;
“And that Specialty Marketing was harmed by that failure.
[[Image here]]
“Now, there’s been partial performance of a contract when performance has been commenced but has not been substantially completed. Where a contractor has partially performed a contract but has not performed all the important parts of the contract, if the failure to perform the balance of the contract is not excused, the contractor cannot recover for partial performance on the contract.
“Substantial performance ... of a contract ... is performance of all its important parts but does not require a full or exact performance of every slight or unimportant detail.
“If you decide that Specialty Marketing has proved [its] claim against Target Media for breach of contract, you also must decide how much money will reasonably compensate Specialty Marketing for the harm caused by the breach. This compensation is called damages. The purpose for such damages is to put Specialty Marketing in as good a position as [it] would have been had Target Media not broken the contract.”
“In reviewing the trial court’s instruction to the jury, this Court reads and considers the entire charge as a whole.” Cooper & Co. v. Lester, 832 So.2d 628, 641 (Ala.2000). Viewing the entire jury charge as a whole, we cannot say that the trial court’s use of the word “all” when describing Specialty Marketing’s argument forecloses recovery by Specialty Marketing for breach of the 2002 distribution contract. The trial court described the contract, the elements of a breach-of-contract claim, and the parties’ arguments. Moreover, the contract itself was admitted into evidence and was made available to the jury, so the jurors were able to look at the contract for themselves when deliberating on the breach-of-contract claim. Therefore, we conclude that the trial court’s statement to *861 the jury that Specialty Marketing’s breach-of-contract claim alleged that Target Media “did not deliver all the magazines” was not a error warranting our overturning the jury’s verdict as to Specialty Marketing’s breach-of-contract claim.
Target Media also argues that Specialty Marketing was not damaged by any alleged breach of contract. Our review of the record reflects otherwise. The evidence before the jury indicates that Specialty Marketing paid Target Media approximately $400,000 over a four-year period for delivery services that, if the jury believed Specialty Marketing’s witnesses, were not performed; that Specialty Marketing paid approximately $900,000 in printing costs over a four-year period, approximately $200,000 of which the jury could have attributed to printing magazines that were thrown away in Oxford, and that Specialty Marketing lost business and profits. ■
In addition, Target Media argues that the damages awarded by the jury were excessive. Target Media contends that there was no evidence from which the jury could have computed compensatory damages for breach of contract in the amount of $851,552.
“““It is well settled that damages awarded for breach of contract should return the injured party to the position he would have been in had the contract been fully performed.’”’ Mannington Wood Floors, Inc. v. Port Epes Transp., Inc., 669 So.2d 817, 822 (Ala.1995) (quoting Med Plus Props, v. Colcock Constr. Group, Inc., 628 So.2d 370, 375 (Ala.1993), quoting in turn Cobbs v. Fred Burgos Constr. Co., 477 So.2d 335, 338 (Ala.1985)). The Mannington Wood Floors Court also recognized:
“ ‘In computing damages for breach of contract, a jury need not achieve “mathematical precision.” Indeed, “ ‘the uncertainty which prevents a recovery is uncertainty as to the fact of the damage and not as to its amount.’ ” Thus, a “ ‘plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.’ ” ’
“669 So.2d at 822 (citations omitted).”
Parsons v. Aaron, 849 So.2d 932, 949 (Ala.2002). Davis testified that from late 2002 through late 2006 his costs for printing thousands of copies of Truck Market News and then shipping those magazines to Oxford, in addition to the amount he paid Target Media for delivery services, were in excess of $1.5 million, and the jury could well have determined the damages awarded based on a percentage of the magazines it determined had been thrown away instead of being delivered. We conclude that the trial court properly upheld the damages award to Specialty Marketing on its breach-of-contract claim.
Finally, Target Media argues that the jury’s verdict in favor of Specialty Marketing on its breach-of-contract claim cannot be sustained because, it argues, the verdict is inconsistent with the jury’s verdict in favor of Target Media on its counterclaim alleging breach of contract. The jury’s verdict form on the breach-of-contract claim stated:
“Breach of Contract
“Specialty Marketing^] Plaintiff vs. Target Media[,] Defendant
“WE, THE JURY, FIND:
“in favor of the plaintiff and against the defendant and assess plaintiffs damages at Eight Hundred & Fifty One Thousand, Five Hundred Fifty Two dollars [ ($851,552.00) ]. •
*862 “We further find in favor of the defendant & against the plaintiff on the defendant’s counterclaim and assess damages at Forty Eight Thousand & Eight Hundred dollars [ ($48,800.00) ].”
We agree that on its face the verdict form allowing the jury to find in favor of both parties on their breach-of-contract claims is inconsistent. Nevertheless, we cannot conclude that the inconsistent verdicts constitute reversible error because none of the parties objected to the use of the verdict form.
After the trial court charged the jury and before the jury began deliberations, the following exchange occurred:
“THE COURT: Now, ladies and gentlemen, before I send you back with all the exhibits and with my verdict forms [which the trial court read to the jury during its charge], I need to check with each side and see if they are satisfied with my charge, give them that opportunity. And so first for the plaintiff, I need to ask, is the plaintiff satisfied with the charge?
“SPECIALTY MARKETING’S ATTORNEY: With the exception of the defendant’s requested jury charge number 4, Your Honor. We expressed that earlier.
“THE COURT: That’s fine. That one is reserved. Anything from the defendants?
“TARGET MEDIA’S AND LEADER’S ATTORNEY: Yeah, we have no objections to the charge.”
In order to preserve the inconsistent-verdict issue for review, Target Media’s counsel should have objected to the verdict form that is now being challenged as inconsistent after the trial court read it to the jury and provided the written verdict form to the jury. Counsel was presented with an opportunity to do so after the trial court instructed the jury; however, he not only failed to object to the verdict form, but also stated that he was satisfied with it. When counsel is presented with an opportunity at the end of the trial court’s charge to the jury to state any objection he- or she has to the charge as given and does not do so, no error as to that charge is preserved for appellate review. Empiregas, Inc. of Ardmore v. Hardy, 487 So.2d 244 (Ala.1986). Therefore, the trial court’s order denying Target Media’s post-judgment motion as to. Specialty Marketing’s breach-of-contract claim is due to be affirmed.
C. Fraudulent Misrepresentation
We first address Target Media and Leader’s argument that Specialty Marketing’s fraudulent-misrepresentation claim was barred by § 6-2-38(1), Ala.Code 1975, Alabama’s two-year statute of limitations for fraud claims. Target Media and Leader allege that Specialty Marketing was aware of facts between February 2003 and August 2004 that put it on notice that its magazines were not being properly distributed, facts disclosed by the spreadsheets provided to it by Target Media. Nevertheless, Target Media and Leader argue, Specialty Marketing failed to act until October 2007, more than three years after it had received the last spreadsheet.
In a fraud action, the running of the limitations period is tolled pursuant to the “discovery rule” found in § 6-2-3, Ala. Code 1975. Section 6-2-3 states: “In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.” Target Media and Leader acknowledge that when a plaintiff discovered facts that would put it on notice of fraud “can be” a *863 jury question, but they argue that this Court has determined in certain circumstances that it is appropriate to enter a JML as to the discovery issue, citing Dickinson v. Land Developers Construction Co., 882 So.2d 291, 298 (Ala.2003). As stated in Dickinson, however, this Court has held that “ ‘ “ ‘[t]he question of when a party discovered or should have discovered the fraud is generally one for the jury.’ ” ’ Potter v. First Real Estate Co., 844 So.2d 540, 546 (Ala.2002) (quoting Ex parte Seabol, 782 So.2d 212, 216 (Ala.2000), quoting in turn Liberty Nat’l Life Ins. Co. v. Parker, 703 So.2d 307, 308 (Ala.1997)).” 882 So.2d at 298. Under the facts of this ease, we conclude that the question of when Specialty Marketing discovered the facts that would have put it on notice of Target Media’s and Leader’s alleged fraud was a question appropriately resolved by the jury. Because the jury returned a verdict for Specialty Marketing as to its fraud claim, it is apparent that the jury concluded that Specialty Marketing’s fraudulent-misrepresentation claim was not barred by the statute of limitations.
We now turn to Target Media and Leader’s argument that Specialty Marketing did not meet its burden of proof as to the fraudulent misrepresentations allegedly made by Target Media and Leader, and, therefore, that the trial court should have granted their motion for a JML and should not have submitted the fraudulent-misrepresentation claim to the jury. In order to prove a claim of fraudulent misrepresentation, Specialty Marketing needed to establish “(1) that [Target Media and Leader] made a false representation, (2) that the misrepresentation involved a material fact, (3) that [Specialty Marketing] relied on the misrepresentation, and (4) that the misrepresentation damaged [Specialty Marketing].” AmerUs Life Ins. Co. v. Smith, 5 So.3d 1200, 1207 (Ala.2008).
In assessing whether the trial court properly denied Target Media and Leader’s motion for a JML as to Specialty Marketing’s fraudulent-misrepresentation claim, it is important to first take note of the various ways in which Target Media and its principals committed the fraud in question. These included:
• Monthly Invoices from the defendants in which Target Media billed Specialty Marketing each month for the full amount due under the 2002 distribution contract. In other words, each month, from the very beginning of the contract until its end, Target Media sent a written statement to Specialty Marketing that implicitly represented that all of Specialty Marketing’s magazines due to be distributed by Target Media during the prior month had in fact been distributed by Target Media.
• Target Media periodically sent to Specialty Marketing “route sheets,” represented by Target Media to have been filled out by its agents or employees, again representing that all of Specialty Marketing’s magazines were being distributed to the appropriate retail establishments.
• Target Media periodically provided to Specialty Marketing “summaries” indicating delivery of all Specialty Marketing’s magazines.
• Between 2003 and December 2006, Specialty Marketing was repeatedly assured orally by defendants Leader, Wallace Adams, and Gordon Adams that all of its magazines were being distributed appropriately.
The record contains substantial evidence that during much of, if not all, the contract term, the above-described representations were false and that they were knowingly made by Target Media and its principals as false representations. It cannot be disputed in this case that the jurors reason *864 ably could have found that Target Media and its principals made fraudulent misrepresentations, that those misrepresentations involved material facts, and that those misrepresentations damaged Specialty Marketing.
The only remaining question for our review is whether there was substantial evidence from which the jurors could have inferred that Specialty Marketing relied on these representations and whether its reliance was reasonable. In this regard, Specialty Marketing' argues as follows:
“The representations to Terry Davis, as the owner of Specialty Marketing, were material. His reliance on them was reasonable, given the values involved, the importance of the activities to his company, Target Media’s status as a major distribut[or], and its apparent expertise at the activities — of which Target Media and its employees assured him. Only an insider of the Defendant could have known that the representations and promises were false.”
Specialty Marketing’s brief, at 49. The jury found Specialty Marketing’s position entirely plausible, as does this Court. Indeed, the record contains substantial evidence, including Davis’s express testimony regarding Specialty Marketing’s reliance upon some of, if not all, the misrepresentations described above, from which the jury could have inferred that Specialty Marketing reasonably relied on these representations to pay Target Media’s invoices month after month and to continue its contractual relationship with Target Media.
Davis explicitly testified to his reliance on the so-called “spreadsheets.” The jury was free to believe that, although the spreadsheets stopped coming at some point, Specialty Marketing and Davis reasonably could have relied upon, and did rely upon, those spreadsheets to make payments to Target Media during the period that Target Media provided them spreadsheets. Furthermore, Target Media and its principals made other misrepresentations as described above, including the implicit misrepresentations by Target Media, through its invoices, that all of Specialty Marketing’s magazines were being distributed each month. These other misrepresentations by Target Media clearly continued until the end of the contract term.
The jury was free to infer that Specialty Marketing’s reliance on all these misrepresentations, including the monthly invoices, was reasonable. Davis testified that he trusted Target Media and its principals and that “it never crossed [his] mind” that Target Media was repeatedly lying to him. Davis further testified that he had no reason to believe that his company’s declining income was caused by Target Media because all the feedback he received from Target Media indicated that Specialty Marketing’s magazines were being distributed to the display sites and that customers were picking up the magazines at those sites. The jury heard Davis testify that he had to rely upon “the people I’m paying the money to, that I have to trust somebody” and that he “did what I thought was right and I thought they were doing their job ... I would never have thought that Target Media had anything to do with this.”
If this Court were to reverse the judgment entered on the jury’s verdict on the fraudulent-representation claim in this case, as Target Media and Leader urge us to do, we would need to hold, as a matter of law, that the circumstances with which Davis and Specialty Marketing were faced required them to assume that Target Media and its various principals were all lying to Davis and Specialty Marketing on a regular basis, despite the lack of evidence that this was the case. We reject Target *865 Media and Leader’s argument that Specialty Marketing did not “reasonably” rely on Target Media’s and Leader’s continual misrepresentations Simply because Davis and Daniels were aware that Specialty Marketing’s income was declining. To so hold would impose an unfair burden on a plaintiff. As a Supreme Court in a sister state has observed:
“ A party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract.’ (Tourek et al., Bucking the ‘Trend’: The Uniform, Commercial Code, the Economic Loss Doctrine, and Common Law Causes of Action for Fraud and Misrepresentation (1999) 84 Iowa L.Rev. 875, 894.) No rational party would enter into a contract anticipating that they are or will be lied to. ‘While parties, perhaps because of their technical expertise and sophistication, can be presumed to understand and allocate the risks relating to negligent product design or manufacture, those same parties cannot, and should not, be expected to anticipate fraud and dishonesty in every transaction.’ (Id. at p. 909.).”
Robinson Helicopter Co. v. Dana Corp., 34 Cal.4th 979, 993, 22 Cal.Rptr.3d 352, 361, 102 P.3d 268, 275-76 (2004).
It is not this Court’s job to decide the credibility of or to assign weight to testimony and other evidence of fraud and the reliance that purportedly occurred in this case. It was for the jury to decide whether it was reasonable for Specialty Marketing to rely upon Target Media’s and Leader’s continual misrepresentations throughout the four-year term of the 2002 distribution contract. Given the evidence before us, we conclude that the jury could have found that Specialty Marketing reasonably relied upon Target Media’s invoices, route sheets, summaries, and the regular oral assurances of its principals to continue its contractual relationship with Target Media and to continue paying Target Media’s invoices each month.' Therefore, the trial court’s order denying Target Media and Leader’s motion for a JML as to Specialty Marketing’s fraudulent-misrepresentation claim is due to be affirmed.
D. Promissory Fraud
Target Media argues that the verdict against it on Specialty Marketing’s promissory-fraud claim cannot stand because, it argues, the jury’s verdict in favor of Leader on that promissory-fraud claim precludes a judgment against Target Media. Target Media relies on Alfa Life Insurance Corp. v. Jackson, 906 So.2d 143, 154 (Ala.2005) (“““[WJhen [a] principal and his agent are sued in [a] joint action in tort for misfeasance or malfeasance of the servant, and his liability for the conduct of said servant is under the rule of responde-at superior, a verdict in favor of the servant entitles the master to have the verdict against him set aside.’ ” ’ ” (quoting Barlow v. Liberty Nat'l Life Ins. Co., 708 So.2d 168, 173 (Ala.Civ.App.1997), quoting in turn Larry Terry Contractors, Inc. v. Bogle, 404 So.2d 613, 614 (Ala.1981), quoting in turn Louisville & Nashville R.R. v. Maddox, 236 Ala. 594, 600, 183 So. 849, 853 (1938))). Target Media maintains that it cannot be held liable for a tort committed by its agent, Leader, when the jury did not find Leader liable on Specialty Marketing’s promissory-fraud claim. However, the jury heard evidence indicating that Jack Humphreville, Target Media’s vice president of acquisitions, initiated contract discussions with Davis and that Gordon Adams and Leader both negotiated the contract with Davis.
This Court found an argument similar to that of Target Media to be well taken in Stevenson v. Precision Standard, Inc., 762 *866 So.2d 820, 827 (Ala.1999), in which Stevenson sued her employer and her supervisor alleging sexual harassment and the jury returned a verdict in favor of the supervisor, but against the employer. The Stevenson Court determined that the verdicts were inconsistent, and stated:
“ ‘A jury verdict for an agent as defendant cannot be reconciled with a verdict against the agent’s principal if the only claim against the principal is based on the underlying negligence of the agent.’ Owens v. Lucas, 604 So.2d 389, 391 (Ala.1992).”
762 So.2d at 827. The Court in Stevenson went on to consider the question of the appropriate disposition of the inconsistent verdicts:
“Ordinarily, in a civil case involving two inconsistent jury verdicts — one on a direct claim and one on a derivative claim, or one on a direct claim and one on a claim based on vicarious liability — on a proper motion both must be set aside. [Owens, 604 So.2d] at 391. However, because Stevenson did not appeal from the judgment in favor of Windsor, that judgment has become final; therefore, the doctrine of res judicata bars a new trial on the issue of Windsor’s liability. Because the judgment against Windsor must stand, a judgment must be entered in favor of Pemco. See de Feliciano v. de Jesus, 873 F.2d 447 (1st Cir.1989) (in light of an inconsistent verdict, corporate codefendant was held entitled to a judgment, where plaintiffs did not appeal from judgment in favor of codefendant president of corporation); see, also, United Steelworkers of America AFL-CIO-CLC v. O’Neal, 437 So.2d 101, 103 (Ala.1983) (on a claim directly against an agent, and against the principal solely on the theory of respondeat superior, ⅛ verdict in favor of the agent works an automatic acquittal of the principal so that [the] verdict against [the principal] must be set aside’); and Perry v. Costa, 97 A.D.2d 655, 469 N.Y.S.2d 193 (1983) (doctrine of res judicata barred new trial on question of employer’s liability, based on final judgment in favor of employee; judgment against employer reversed).”
762 So.2d at 827 (footnote omitted). In this case, the verdicts on Specialty Marketing’s promissory-fraud claims are not necessarily inconsistent because Humphre-ville and Gordon Adams, as well as Leader, also acted as agents for Target Media. The jury heard evidence indicating that Humphreville made the initial representations, and Leader and Gordon Adams each testified that they intended to perform the contract when they entered into it. The distinction between this case and Stevenson is that Humphreville and Gordon Adams were also agents for Target Media and there is record evidence indicating that Gordon Adams and Leader both acted on behalf of Target Media in negotiating the 2002 distribution contract with Davis. Therefore, Target Media is not entitled to a JML in its favor as to Specialty Marketing’s promissory-fraud claim against it based upon the jury’s exoneration of Leader.
Target Media also argues that the verdict against it on Specialty Marketing’s promissory-fraud claim cannot stand because, it argues, Specialty Marketing did not prove the required elements of promissory fraud.
“To state a claim of promissory fraud, the plaintiff must allege facts showing ‘(1) a false representation; (2) of an existing material fact; (3) that is [reasonably] relied upon; (4) damage resulting as a proximate cause[; (5) that] at the time of the misrepresentation, the defendant had the intention not to perform the promised act[;] and (6) that *867 the defendant had an intent to deceive.’ ”
Bethel v. Thorn, 757 So.2d 1154, 1159 (Ala.1999) (quoting Pinyan v. Community Bank, 644 So.2d 919, 923 (Ala.1994)).
Target Media argues that Specialty Marketing failed to present evidence indicating that Target Media intended not to perform under the 2002 distribution contract and intended to deceive Specialty Marketing at the time it negotiated the 2002 distribution contract. In making this argument, Target Media relies on testimony from Target Media executives Leader and Gordon Adams, noting that both essentially testified that they intended to perform the contract when they entered into it and, specifically, that neither of them testified that he had an intent not to perform or an intent to deceive at the time the contract was formed.
Target Media’s argument overlooks the fact that the jury was free to, and did, assign little or no credibility or weight to the testimony of Leader and Gordon Adams. The absence of an admission of an intent to deceive by one who harbors an intent to deceive cannot be the sine qua non of a viable promissory-fraud action. By focusing on the lack of an admission by the alleged tortfeasors, and their protestations of innocence, Target Media overlooks the substantial circumstantial evidence of promissory fraud.
Circumstantial evidence can be used to establish an intent not to perform and an intent to deceive. Indeed, because proof of an alleged tortfeasor’s thoughts is, by its nature, difficult, circumstantial evidence often is the only way to prove promissory fraud.
“ “While the mere failure to perform the promised act is not by itself sufficient evidence of fraudulent intent, for purposes of a promissory-fraud claim, “the factfinder may consider that failure, together with other circumstances, in determining whether, at the time the promise was made, the promisor intended to deceive.” ’
“Ex parte Grand Manor, Inc., 778 So.2d 173, 182 (Ala.2000) (quoting Murphy v. Broke, 668 So.2d 513, 516 (Ala.1995)). A defendant’s intent to deceive can be established through circumstantial evidence that relates to events that occurred after the . alleged misrepresentations were made. Vance v. Huff, 568 So.2d 745, 750 (Ala.1990).”
Byrd v. Lamar, 846 So.2d 334, 343 (Ala.2002).
The circumstantial evidence that warranted submission of the promissory-fraud claim to the jury and upon which the jury reasonably could have inferred an intent on Target Media’s part not to perform the promised undertakings includes the following:
• Target Media was engaging in the practice of failing to distribute other publishers’ magazines leading up to and at the time it negotiated and entered into its contract with Specialty Marketing. Target Media warehouseman Justin Thurman testified concerning Target Media’s practices during the months leading up to Specialty Marketing’s contracting with Target Media. He stated that Target Media had a preexisting practice of throwing away large quantities of customers’ current magazines before they were ever delivered.
• The jury could have inferred that, from the very beginning of the contract period, Target Media engaged in a- practice of prioritizing the loading and delivery of its magazines over the loading and delivery of Specialty Marketing’s magazines. Gordon Adams, Wallace Adams, and Fowler testified that when Target Media’s delivery personnel picked up maga *868 zines for distribution, they were under company orders to load all of Target Media’s magazines into their delivery vehicles first and to load magazines delivered for other companies, such as Specialty Marketing, only if there was room left in the delivery vehicle. The Target Media employees testified that often there was no room left in the delivery vehicles for any magazines other than the ones published by Target Media, so other magazines were simply thrown away or delivered to the recycling plant. Specialty Marketing notes in its brief that “[t]he schematics Ed Leader approved, by which [magazines] were loaded for delivery and display, never included [Specialty Marketing’s magazines], and the practice of throwing away new [magazines] which never had been loaded was in place at the time of the promises.” Specialty Marketing’s brief, p. 53.
Gordon Adams testified that the schematics — which were essentially blueprints telling truckers in what order to load the deliveries on their truck and what layout was to be used for magazine displays at the delivery locations — did not include Speciality Marketing’s magazine. Burt likewise testified that the schematics never included Specialty Marketing’s magazine. Given that these schematics existed from the start of the contract, this testimony constitutes evidence indicating that Target Media never intended to fulfill its contract with Speciality Marketing.
• Target Media failed to perform its contractual obligations beginning during the first year of the 2002 distribution contract.
• Burt also testified that he was instructed by Target Media to falsify route sheets to show that magazines had been delivered that in fact had not been delivered. Other witnesses also testified that Target Media had a practice of instructing their drivers to falsify their route reports to make the numbers look good.
• The jury had before it substantial evidence of Target Media’s business practices and general willingness to deceive Specialty Marketing for its own gain.
The foregoing constitutes substantial circumstantial evidence from which the jury could have inferred that Target Media engaged in promissory fraud, i.e., it was “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer” that Target Media made its promises to Specialty Marketing without ever having had an intent to keep them. See West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Therefore, the trial court’s order denying Target Media’s motion for a JML as to Specialty Marketing’s promissory-fraud claim is due to be affirmed.
E. Disposition of Target Media and Leader’s Motion for a JML
We have concluded that Specialty ' Marketing offered substantial evidence showing that Target Media and Leader made false representations and that Target Media and its principals made representations with the intention not to perform the act promised. Because the evidence supports a finding of fraudulent misrepresentation and promissory fraud, we have concluded that the trial court properly denied Target Media and Leader’s motion for a JML as to Specialty Marketing’s fraudulent-misrepresentation claim and Target Media’s motion for a JML as to the promissory-fraud claim. Therefore, those claims were properly submitted to the jury, and, as noted, that portion of the trial court’s order denying Target Media and Leader’s motion for a JML as to Specialty Marketing’s fraudulent-misrepre *869 sentation and promissory-fraud claims is due to be affirmed.
As to Specialty Marketing’s breach-of-contract claim, however, we conclude that Specialty Marketing offered substantial evidence that Target Media breached the contract; therefore, the trial court did not err in denying Target Media’s motion for a JML as to Specialty Marketing’s breach-of-contract claim, and that claim was properly submitted to the jury.
F. Motion for a New Trial
We next address whether the trial court should have granted Target Media’s motion for a new trial as to Specialty Marketing’s breach-of-contract claim. Because we hold that the trial court properly submitted the breach-of-contract claim to the jury based on Target Media’s failure to object to the trial court’s use of the verdict form that allowed the jury to return inconsistent verdicts, we conclude that the judgment entered on those jury verdicts in favor of Specialty Marketing as to its breach-of-contract claim and in favor of Target Media as to its breach-of-contract counterclaim is due to be affirmed. We likewise conclude that sufficient evidence was presented to support the jury’s damages awards for breach of contract. Therefore, the trial court properly denied Target Media’s motion for a new trial as to the breach-of-contract claim.
G. Motion for a Remittitur
Finally, Target Media and Leader argue that they are entitled to a hearing on that portion of their postjudgment motion requesting a remittitur of the punitive-damages awards and to an order detailing the trial court’s findings as a result of that hearing. Section 6 — 11—23(b), Ala. Code 1975, states:
“In all cases wherein a verdict for punitive damages is awarded, the trial court shall, upon the motion of any party, either conduct hearings or receive additional evidence, or both, concerning the amount of punitive damages.”
In their postjudgment motion, Target Me.dia and Leader requested a Hammond/Green Oil hearing, but the trial court summarily denied their post-judgment motion without holding the requested hearing to consider Target Media and Leader’s argument that the punitive-damages awards were excessive.
This Court has clearly held that a defendant is entitled to a Hammond/Green Oil hearing if the defendant requests such a hearing. In Southeast Environmental Infrastructure, this Court held: “In its post-judgment motion for a remittitur, SEI timely requested a hearing on that motion. Therefore, SEI was entitled to such a hearing, and the trial court erred in not conducting a hearing on SEI’s remittitur motion before it denied the motion.” 12 So.3d at 50. In Lifestar Response of Alabama, Inc. v. Lemuel, 908 So.2d 207, 225 (Ala.2004), this Court held that Lifestar would have been entitled to a Hammond/Green Oil hearing if it had properly requested one. Here, the trial court did not hold the hearing Target Media and Leader requested in their postjudgment motion; instead, it denied that motion without explanation. When Specialty Marketing asked the trial court to enter an order explaining the reasons it had denied the postjudgment motion and Target Media and Leader again requested a Hammond/Green Oil hearing, the trial court responded by scheduling the requested hearing, but the scheduled date was outside the time in which Target Media and Leader were required to appeal from the judgment. Moreover, as we held in Section III.A. of this opinion, the trial court lost jurisdiction to hold such a hearing after it denied Target Media and Leader’s postjudgment motion.
*870 “This Court and the Legislature have established a constitutionally appropriate system for reviewing a contention that a punitive-damages award is excessive. See Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989); and § 6-11-23(b), Ala.Code 1975. Additionally, the United States Supreme Court has established various ‘guideposts’ and considerations for assessing whether punitive damages are excessive, in a series of cases including, most notably, BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).”
Lifestar Response, 908 So.2d at 225.
In Williford v. Emerton, 935 So.2d 1150, 1156 (Ala.2004), this Court explained the reasoning behind the requirement of a Hammond/Green Oil hearing, as well as the requirement that the trial court enter an order containing its findings as a result of that hearing.
“[Without a written statement of the reasons for that denial [of a defendant’s postjudgment motion challenging an award of punitive damages,] the requirements of Hammond have not been satisfied. As we explained in Love v. Johnson, 775 So.2d 127, 127-28 (Ala.2000), such a written statement is necessary before this Court can conduct a proper review on appeal:
“ ‘In Hammond [v. City of Gadsden, 493 So.2d 1374 (Ala.1986) ], this Court required that a trial court “reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on the grounds of excessiveness of the damages.” 493 So.2d at 1379; see also ALFA Mut. Ins. Co. v. Brewton, 554 So.2d 953 (Ala.1989). In Hammond, this Court stated the reason for the requirement:
“ ‘ “[T]he trial judge is better positioned to decide whether the verdict is ... flawed [as excessive]. He has the advantage of observing all of the parties to the trial — plaintiff and defendant and their respective attorneys, as well as the jury and its reaction to all of the others. There are many facets of a trial that can never be captured in a record, so that the appellate courts are at a special disadvantage when they are called upon to review [a] trial [court’s] action in this sensitive area....”
“ ‘493 So.2d at 1378-79.’
“When a trial court fails to put in writing its reasons for denying a motion to review a punitive-damages award for ex-cessiveness, this Court’s practice has been to remand the cause for the trial court to enter an order in compliance with Hammond. See, e.g., Love, 775 So.2d at 128; Spencer v. Lawson, 815 So.2d 502 (Ala.2001); Southern Pine Elec. Coop. v. Burch, 878 So.2d 1120 (Ala.2003). We therefore remand this case to the trial court for the entry of an order that complies with the requirements of Hammond. On return to remand, the Willifords will have the opportunity to renew their argument that the punitive-damages award is outside the constitutional parameters set forth in Gore and Hammond/Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), should they still wish to do so.”
935 So.2d at 1156. Accordingly, we remand this case to the trial court for that court to conduct a Hammond/Green Oil hearing concerning the jury’s punitive-damages award against Target Media and Leader as to Specialty Marketing’s fraudulent-misrepresentation claim and the punitive-damages award against Target Media as to Specialty Marketing’s promissory- *871 fraud claim and to enter an order stating its reasons for granting or denying Target Media’s and Leader’s motion for a remitti-tur of those punitive-damages awards. On return to remand, Target Media and Leader can renew their argument to this Court, if they so desire, that the punitive damages awards are excessive. The trial court shall make a return to this Court within 90 days from the date this opinion is released.
TV. Conclusion
We affirm the trial court’s order denying Target Media’s motion for a JML and/or for a new trial as to Specialty Marketing’s breach-of-contract claim and as to Target Media’s breach-of-contract counterclaim. Moreover, we affirm the trial court’s order denying Target Media and Leader’s motion for a JML as to Specialty Marketing’s fraudulent-misrepresentation and promissory-fraud claims, but we remand the cause for the trial court to hold a Hammond/Green Oil hearing and to make a return to this Court within 90 days of the date of the filing of the remittitur.
APPLICATION GRANTED; NO-OPINION ORDER OF AFFIRMANCE OF APRIL 19, 2013, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; AND REMANDED WITH INSTRUCTIONS.
PARKER and WISE, JJ., concur.
MOORE, C.J., and SHAW and BRYAN, JJ., concur in the result.
MURDOCK, J., concurs in the rationale in part and concurs in the result.
STUART, BOLIN, and MAIN, JJ., concur in part and dissent in part.

. In addition to Target Media Partners Operating Company, LLC, Specialty Marketing also sued Target Media Partners, Inc., and Target Media Partners Operating Company. After learning that Target Media's correct corporate name is "Target Media Partners Operating Company, LLC,” Specialty Marketing proceeded with the lawsuit against only that entity.

. On November 8, the trial court canceled the hearing set for November 9 because, it said, as a result of the filing of a notice of appeal on September 21, 2010, it was "without jurisdiction to rule on any pending motions at this time due to the appellate status of this case.”

. After this Court issued our opinion on original submission affirming in part and reversing in part the trial court's judgment, Specialty Marketing filed an application for rehearing, and, on application for rehearing, we withdrew our December 21, 2012, opinion and entered a no-opinion order of affir-mance on April 19, 2013. Target Media then filed the application for rehearing that is now before this Court.

. Because Specially Marketing did not cross-appeal the judgment in favor of Target Media on its counterclaim, we need not discuss how Target Media needed to establish that the breach of contract alleged in its counterclaim occurred.